## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LUIS RULLAN                                 :
                                            :
                                            :
     v.                :      Civil No. CCB-12-2412
                                            :
                                            :
JILL GODEN and FRED GREENBERG               :
                                            :

## MEMORANDUM

    Plaintiff Luis Rullan, a Spanish national, filed this action against Jill Goden and her

father, Fred Greenberg, seeking damages for various claims arising from a failed business

relationship Rullan alleges he was falsely induced to enter.  Before the court are Rullan's motion

for joinder of additional defendants, (ECF No. 36), Rullan's motion to file an amended

complaint, (ECF No. 39), and the defendants' motion to dismiss and motion to strike, (ECF No.

41).  The issues in this case have been fully briefed, and no hearing is necessary.  *See* Local R.

105.6.  For the reasons stated below, the court will grant the motion to join Timber Ridge

Incorporated, Youth World, Ltd., and Youth World International, Ltd., deny the motion to join

Timber Ridge Camp, deny the motion to strike, grant the motion to amend, and grant in part and

deny in part the motion to dismiss.

## BACKGROUND

    Timber Ridge Camp ("the Camp") is a summer camp in High View, West Virginia.

(Am. Compl., ECF No. 39-1, ¶ 11.)[1]  The Camp is owned by Timber Ridge Incorporated

("TRI"), (*id.* ¶ 12), and administered by a separate corporation called Youth World, Ltd.

---

[1] The court takes the allegations in Rullan's amended complaint as true for purposes of resolving the motion to
dismiss.

("YWL"), (*id.* ¶ 13). Rullan began attending the Camp in 1990 at the age of six, and continued

attending for the next ten years. (*Id.* ¶ 18.) Rullan developed a close relationship with the family

that managed the Camp, including Fred Greenberg and his daughter Jill Goden. (*Id.* ¶¶ 16, 19.)

Greenberg and Goden each owned 50 percent of TRI and YWL. (*Id.* ¶ 16.)

      In November 2010, Rullan, Goden, and Greenberg spoke by telephone about the

possibility of Rullan becoming Goden's partner in managing the Camp. (*Id.* ¶ 21.) Rullan

discussed the Camp's finances with Goden and Greenberg by telephone and email, and Goden

and Greenberg significantly understated both the acreage of the Camp and the Camp's debt, and

inflated revenue per camper. (*Id.* ¶ 23.) Goden and Greenberg also withheld information

concerning "the corporate structure and ownership of the Camp," expenses and salaries, cash

shortfalls, the full extent and nature of the Camp's debts, and the Camp's use of short-term

bridge loans. (*Id.* ¶ 24.) They also withheld a January 2010 appraisal "which would have

revealed the true size of the Camp and its value in light of its actual debt." (*Id.* ¶ 25.) According

to Rullan, the purpose of this alleged deception was to induce Rullan to leave his job as a

consultant in Spain, contribute capital to the Camp, and use his family's social contacts to recruit

European campers. (*Id.* ¶ 38.)

      In early December 2010, Rullan traveled to St. Andrews, Florida, to meet with Goden

and Greenberg, present his management plan, and discuss a business relationship. (*Id.* ¶¶ 22,

32.) Rullan alleges that his presentation was based on the false information he had received from

Goden and Greenberg, who did not correct him during the presentation. (*Id.* ¶ 35.) Following

the presentation, Goden and Greenberg entered into an oral employment agreement ("the

Employment Agreement") with Rullan, under which Rullan would be paid "a $72,000 annual

salary to work at the Camp full-time" and would share management duties with Goden.  (*Id.* ¶ 39.)  "Rullan agreed to start full-time with Goden in January, 2011 by . . . recruiting campers in Europe," before he came to the Camp that summer.  (*Id.* ¶ 40.)  Rullan's salary was to be paid in monthly installments, with the size of each installment varying based on the season.  (*Id.* ¶ 41.) Rullan and Goden would split the cost of establishing a new company, Youth World International, Ltd. ("YWI"), to help Rullan and his fiancée obtain United States visas to work at the Camp.  (*Id.* ¶¶ 14, 41-42.)  Rullan memorialized "much of the discussion and terms" of the Employment Agreement in a writing titled "Minutes meeting December 7, 2010 – St. Andrews," which he emailed to Goden and Greenberg.  (*Id.* ¶¶ 42-43.)  Rullan alleges he would not have agreed to the Employment Agreement's terms had he known the Camp's true financial state and size, as well as Goden's intention to manage without Rullan's involvement.  (*Id.* ¶ 44.)

Over the following months, Goden began to refer to Rullan as her partner.  (*Id.* ¶ 45.) Goden and Rullan verbally agreed that Rullan would assume Greenberg's share of the Camp's ownership, for which Rullan would pay ten annual installments of $50,000, and they decided to put their agreement in writing that summer.  (*Id.* ¶¶ 46-47.)  Rullan and Goden then formed YWI, with Rullan contributing $55,000 for its capitalization and Goden contributing nothing. (*Id.* ¶ 51.)  Nevertheless, corporate documents described Goden and Rullan as splitting the cost, and they became co-owners of the new entity.  (*Id.*)  Within a week, Goden told Rullan she needed to "borrow" the $55,000 capitalization to pay the Camp's bills, but that she would quickly reimburse the YWI account.  (*Id.* ¶ 52.)  Rullan agreed.  (*Id.*)

When Rullan arrived at the Camp in May 2011, he "started to learn" about the Camp's true financial situation, learned that the Camp consisted of 70 acres rather than several hundred,

and learned of the existence of TRI.  (*Id.* ¶ 54.)  On June 4, 2011, at Goden's house at the Camp,

Rullan, Goden, and Greenberg met to discuss Rullan's purchase of Greenberg's full equity stake

in the Camp.  (*Id.* ¶ 55.)  Neither Goden nor Greenberg disclosed to Rullan that Greenberg had

acquired substantial debt in his capacity as president of TRI (and, in fact, had defaulted on that

debt), or that several disputes existed that could give rise to litigation involving the Camp.  (*Id.*

¶¶ 56-58.)

On August 8, 2011, Goden met with Rullan at the Camp's office and asked him, as her

"full partner," to lend an additional $50,000 to the Camp, telling him that he had co-equal

financial responsibility for it.  (*Id.* ¶ 60.)  Relying in part on Goden's and Greenberg's

representations during the June meeting that Rullan was Goden's full partner, Rullan lent the

balance of his life savings, $50,000, to the Camp.  (*Id.* ¶ 62.)

On August 15 and 18, 2011, in the Camp's office, Rullan, Goden, and Greenberg again

discussed Rullan's involvement in the Camp's operations.  (*Id.* ¶ 65.)  Goden and Greenberg

again told Rullan he and Goden were full partners and the Camp's co-owners, and that Goden

and Rullan shared equal financial responsibility for the Camp.  (*Id.*)  On August 24, 2011,

Greenberg, Goden, and Rullan each initialed every page of, and signed, an agreement titled

"Partnership agreement August 24th, 2011 – Timber Ridge Camp, HV, WVA" ("the Partnership

and Stock Agreement").  (*Id.* ¶ 66.)  Under this agreement, Greenberg conveyed his 50 percent

share in the Camp (that is, of TRI and YWL) to Rullan in exchange for ten $50,000 payments to

be paid over ten years.  (*Id.* ¶¶ 67-68.)  The Partnership and Stock Agreement also required,

among other things, (1) an "equal salary" for Rullan and Goden (*id.* ¶ 68(iii)); (2) that Goden and

Rullan "relegate" Greenberg "from his debt obligations" related to the Camp, and assume

Greenberg's "personal guaranties" (*id.* ¶¶ 68(iv)-(v)); (3) that "[b]oth partners" have a right of refusal before the other sell stock in the Camp (*id.* ¶ 68(vi)); (4) that decisions "be made by [the] mutual agreement" of Goden and Rullan, and that a procedure be developed to establish a decision-making process (*id.* ¶ 68(vii)-(viii)); (5) that Goden and Rullan both approve "any investment or expense for the company for over $5,000" (*id.* ¶ 68(ix)); (6) that $50,000 of the $55,000 Rullan had provided to YWI be considered payment for "the first 5% of the total stock of Youth World LTD and . . . 5% of the total stock of Timber Ridge Inc." owned by Greenberg (*id.* ¶ 68(xi)); and (7) that following the agreement, "a due diligence of the company and the additional legal papers required for the transaction . . . be made" (*id.* ¶ 68(xv)).  Rullan alleges he would not have entered into the agreement, and would have demanded the return of "his earlier $105,000 [in] loans," had he "known the facts" about Greenberg's and the Camp's finances.  (*Id.* ¶ 71.)

Rullan alleges Greenberg and Goden told Rullan they would provide further financial information to him concerning the Camp, and would "hire an attorney to execute additional legal documents," but never did so.  (*Id.* ¶ 73.)  Rullan also alleges Goden told him the Camp had sufficient financial resources to pay them both between $72,000 and $100,000, but the Partnership and Stock Agreement should not include salary information because Goden wanted to conceal that information from Greenberg.  (*Id.* ¶¶ 69, 72.)  Rullan now believes Goden "did not want a written record of the salary that she agreed Rullan would receive because she knew that the Camp could not afford to pay Rullan even $72,000, let alone $100,000, and she never intended for Rullan to receive such a salary."  (*Id.* ¶ 72.)  Rullan received $20,000 as salary in 2011.  (*Id.* ¶ 78.)

Throughout 2011 and the beginning of 2012, Goden denied Rullan access to the Camp's financial records, and refused to allow him to supervise employees, limit expenses, or otherwise participate fully in the business.  (*Id.* ¶ 79.)  During this time, the Camp suffered severe financial problems.  (*Id.* ¶ 80.)  Rullan alleges that Goden used the Camp's funds to pay personal and family expenses, including those of Greenberg, and commingled the Camp's funds with her own. (*Id.* ¶¶ 82-83.)  Goden hired new accountants but refused to allow Rullan to contact them.  (*Id.* ¶ 85.)  As the Camp's financial condition worsened, Goden demanded that Rullan either contribute additional, personal funds to the Camp or bring in many more campers.  (*Id.* ¶ 87.)  During the first five months of 2012, Rullan received only $7,000 as salary, despite helping recruit 51 European campers.  (*Id.* ¶¶ 90-91.)

In the spring of 2012, Greenberg's wife passed away.  (*Id.* ¶ 97.)  Rullan alleges Greenberg now had access to a substantial estate, and "wished to renege" on the Partnership and Stock Agreement so that he could involve himself in Camp management.  (*Id.*)  Without Rullan's knowledge or approval, Greenberg began lending the Camp a substantial amount of money.  (*Id.*) In early May 2012, Rullan told Goden he wanted to keep a portion of the deposits he had collected from European campers.  (*Id.* ¶ 101.)  Goden reacted angrily and told him the Camp desperately needed the money.  (*Id.*)  Rullan sent the money to Goden, but demanded to know when he would be paid, as he had amassed significant personal debt.  (*Id.*)

On May 18, 2012, Greenberg and Goden attempted to terminate Rullan's association with the Camp by writing him an email indicating they were "unable to offer [him] a position working at Timber Ridge this summer."  (*Id.* ¶ 102.)  On May 20, 2012, Goden sent Rullan an email indicating that if he came to the Camp to retrieve his belongings, which were packed in three

sealed boxes, he would "be escorted off [the] property by [the] sheriff," and "it will be ugly."

(*Id.* ¶¶ 103-04.)[2]  On June 5, 2012, Goden "seized control" of Rullan's Camp email account so

that he could not access the account, which contained personal messages as well as

correspondence with Rullan's Spanish attorney.  (*Id.* ¶ 117.)  Rullan attempted to purchase

additional shares of YWL and TRI, as he believed he was entitled to under the Partnership and

Stock Agreement, by tendering one check for $25,000 to Goden and Greenberg's attorney on

January 30, 2013, and another of the same amount on June 29, 2013.  (*Id.* ¶ 94.)  Greenberg did

not accept the payments.  (*Id.*)

        Rullan filed this suit on July 14, 2012.  Goden and Greenberg filed a motion to dismiss, a

motion for a more definite statement, and a motion to strike.  The court dismissed without

prejudice Rullan's fraud claim for failure to satisfy the heightened pleading standards under

Federal Rule of Civil Procedure 9(b), but denied the motion to dismiss as to each of Rullan's

other five counts, and denied the motion for a more definite statement and the motion to strike.

Rullan moved to join additional defendants, including YWI, YWL, TRI, and the Camp itself, and

moved to amend his complaint.  Goden and Greenberg filed a motion to dismiss and a motion to

strike.  On August 18, 2014, Goden filed a suggestion of bankruptcy.  Because Rullan moved to

amend pursuant to the court's scheduling order, and the motion to dismiss is directed at the

amended complaint, the court will grant the motion to amend.

## ANALYSIS

### I.  Goden's Suggestion of Bankruptcy

        On August 18, 2014, Goden filed a suggestion of bankruptcy, advising that she had filed

---

[2] At some point after Rullan filed his complaint, Rullan received one box from High View, West Virginia, containing what he asserts was just a portion of the belongings he had left at the Camp as well as property that was not his, including dirty laundry.  (Am. Compl. ¶ 105.)

a Chapter 13 bankruptcy petition and the instant case was subject to an automatic stay under 11

U.S.C. § 362(a).  When a debtor files for bankruptcy protection, 11 U.S.C. § 362(a)(1)

automatically stays "the commencement or continuation . . . of a judicial, administrative, or other

action or proceeding against the debtor that was or could have been commenced before the

commencement of the [bankruptcy] case . . . ."  11 U.S.C. § 362(a)(1).  Accordingly, Rullan's

suit is stayed as to Goden, and the court will not assess claims against her for purposes of

resolving the motions at issue here.

## II.  Rullan's Motion for Joinder of Additional Defendants

On November 4, 2013, Rullan moved to join four additional defendants: YWI, YWL,

TRI, and the Camp itself.  Greenberg does not oppose the motion to join YWI, and the court

therefore will grant the motion as to that entity.  Greenberg does, however, oppose the motion to

join YWL, TRI, and the Camp itself.

Greenberg argues the Camp may not be added as a defendant because it is owned and

operated by TRI and YWL, and is closer "to a desk or a computer" than an entity susceptible to

suit.  (Def.'s Mot. to Dismiss and Mot. to Strike 2.)   Federal Rule of Civil Procedure 17(b)(3)

provides that a non-corporate entity's capacity to sue and be sued is governed "by the law of the

state where the court is located."  In Maryland, "[a]n unincorporated association, joint stock

company, or other group which has a recognized group name may sue or be sued in the group

name on any cause of action affecting the common property, rights, and liabilities of the group."

Md. Code Cts. & Jud. Proc., § 6-406(a).  This statute does not, however, expand "the kinds of

unincorporated entities that may be sued in their group name to include amorphous groups

having no clear separate identity, simply because they have a group name."  *Bourexis v. Carroll*

*Cnty. Narcotics Task Force*, 625 A.2d 391, 396 (Md. Ct. Sp. App. 1993). The Camp has no "clear separate identity" from TRI and YWL, the entities that own and manage it, and Rullan has pointed to no authority suggesting otherwise. Accordingly, the court will deny Rullan's motion to join the Camp as a defendant.

The court will, however, grant Rullan's motion to join YWL and TRI as defendants. Once they are served, YWL, TRI, and YWI may assert whatever arguments they believe are appropriate by way of a motion to dismiss or for summary judgment, including the argument that Rullan has not alleged facts against them sufficient to treat them as defendants in this action. Because the action is stayed as to Goden, and because YWI, YWL, and TRI have not had the opportunity to respond to Rullan's allegations, the court will treat Greenberg as the sole defendant for purposes of resolving the motion to strike and motion to dismiss.

### III. The Defendants' Motion to Strike

Greenberg moved to strike various parts of Rullan's amended complaint, as well as the amended complaint as a whole. Federal Rule of Civil Procedure 12(f) permits a district court, on motion of a party, to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Rule 12(f) motions are generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" *Waste Mgmt. Holdings, Inc. v. Gilmore,* 252 F.3d 316, 347 (4th Cir. 2001) (citations omitted).

Greenberg first argues Rullan's request for punitive damages should be stricken because contract law does not provide for punitive damages. In West Virginia, which provides the controlling substantive law for much of this case, "[g]enerally, absent an independent, intentional

9

tort committed by the defendant, punitive damages are not available in an action for breach of contract." *Berry v. Nationwide Mut. Fire Ins. Co.*, 381 S.E.2d 367, 374 (W. Va. 1989).  Because Rullan has alleged several intentional torts, including fraud, the court will not strike his request for punitive damages.

Second, Greenberg argues Rullan's request for attorney's fees should be stricken because there is no legal precedent to permit their recovery.  In West Virginia, "[a]s a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement *except when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons*." *Smith v. First Cmty. Bancshares, Inc.*, 575 S.E.2d 419, 434 (W. Va. 2002) (emphasis added).  *See also Bowling v. Ansted Chrysler-Plymouth-Dodge, Inc.*, 425 S.E.2d 144, 150-51 (W. Va. 1992) (holding that attorney's fees may be awarded in fraud cases because fraud falls within the "bad faith" exception to the "American Rule" that attorney's fees are generally not recoverable).  Rullan has asserted a cause of action against Greenberg based on fraud, and part of the gravamen of Rullan's amended complaint is that Greenberg acted in bad faith.  The court therefore will not strike the request for attorney's fees.

Third, Greenberg argues that all counts pertaining to stock owned by Greenberg should be stricken as immaterial as to Goden, because Greenberg was the only person with authority to sell his own stock.  All counts as to Goden have been automatically stayed by virtue of her bankruptcy filing.  The court therefore will not strike the counts in the manner Greenberg seeks.

Finally, Greenberg argues Rullan's amended complaint should be entirely stricken because it is convoluted and contradictory.  It is true that the amended complaint is unnecessarily

long and repetitive, and these attributes hinder the court's assessment of Rullan's claims. But the amended complaint has put Greenberg on adequate notice of the subject matter of the suit, and the court therefore declines to take this drastic step.

Accordingly, Greenberg's motion to strike will be denied in its entirety.

## IV. The Defendants' Motion to Dismiss

Greenberg moved to dismiss all counts but Count Four's unjust enrichment claim under Federal Rule of Civil Procedure 12(b)(6). When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters*, 684 F.3d at 439 (citation

omitted).  "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to

relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from

conceivable to plausible.'"  *Id.*  (quoting *Twombly*, 550 U.S. at 570).

In considering a Rule 12(b)(6) motion, the court need not limit its review to the

pleadings.  It can also take judicial notice of public records, including statutes, and can "consider

documents incorporated into the complaint by reference, as well as those attached to the motion

to dismiss, so long as they are integral to the complaint and authentic."  *United States ex rel.*

*Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014)

(citations and internal quotation marks omitted).

The amended complaint incorporates by reference a document Rullan drafted titled

"Minutes meeting December 7, 2010 – St. Andrews," (Am. Compl. ¶ 42), and Rullan himself

included the minutes as an exhibit with an earlier motion, (Pl.'s Mot. for Prelim. Inj., ECF No.

18-4).  The court therefore considers this document in addressing Greenberg's motion.

### A.  Count One: Breach of Contract

Rullan alleges the existence of two contracts, both of which he argues Greenberg

breached: (1) an oral employment agreement between Rullan, Goden, and Greenberg, reached in

Florida in early December 2010,[3] (Am. Compl. ¶¶ 40-43); and (2) a written partnership and

securities purchase agreement between Rullan, Goden, and Greenberg, reached in West Virginia

on August 24, 2011, (*Id.* ¶¶ 66-68).

As a federal court sitting in diversity, the court applies Maryland's choice of law rules.

---

[3] The precise date on which the Employment Agreement was reached is unclear.  Rullan's meeting minutes are dated December 7, 2010, but the amended complaint does not appear to reveal whether Rullan drafted the minutes on this date, whether the agreement was entered into on this date, or both.  Whether the Employment Agreement was reached on December 5, 6, or 7 does not affect the court's determinations in this case.

*Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941).  "When determining which law controls the enforceability and effect of a contract, [Maryland courts] generally appl[y] the principle of *lex loci contractus.*  Under this principle, the law of the jurisdiction where the contract was made controls its validity and construction."  *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988).  "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs."  *Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 790 A.2d 720, 728 (Md. Ct. Spec. App. 2002).  The parties correctly agree Florida law governs the Employment Agreement,[4] and West Virginia law governs the Partnership and Stock Agreement.

### 1.  The Employment Agreement

Rullan alleges he, Goden, and Greenberg entered into a binding oral employment agreement when Rullan met with Goden and Greenberg in St. Andrews, Florida, in early December 2010.  (Am. Compl. ¶¶ 40, 42.)  Greenberg, however, argues this alleged agreement is rendered unenforceable by Florida's statute of frauds.

Florida's statute of frauds provides, in relevant part, that "any agreement that is not to be performed within the space of 1 year from the making thereof . . . shall be in writing and signed by the party to be charged therewith . . . ."  Fla. Stat. Ann. § 725.01.  "The statute should be strictly construed to prevent the fraud it was designed to correct, and so long as it can be made to effectuate this purpose, courts should be reluctant to take cases from its protection."  *Yates v. Ball*, 181 So. 341, 344 (Fla. 1937).  "[I]n order to avoid the statute of frauds, the agreement must

---

[4] Greenberg states "there is no disagreement between the parties that Florida law would govern the [Employment] Agreement, if it were an actual binding agreement."  (Def.'s Reply 5, ECF No. 48.)  Of course, some body of law must also govern whether the parties entered into such an agreement.  Because Greenberg cites only Florida law to support his argument that the Employment Agreement is unenforceable, the court understands Greenberg's statement as simply another argument that no binding agreement was created, rather than an assertion that Florida law does not govern.

have been capable of performance within one year from its 'making.'" *First Realty Inv. Corp. v. Gallaher*, 345 So. 2d 1088, 1089 (Fla. Dist. Ct. App. 1977). "The primary factor to be utilized in determining whether or not an oral contract is to be performed within the one year limitation of the statute is, of course, the intent of the parties." *Id.*

Greenberg notes that Rullan's amended complaint states "Rullan agreed to start full-time with Goden in January, 2011," (Am. Compl. ¶ 40), and the meeting minutes Rullan drafted state he "will be working as an employee for one year (starting officially in January)," (Pl.'s Mot. for Prelim. Inj., ECF No. 18-4). Because the parties entered into the Employment Agreement in early December 2010, and because that agreement provided for a one-year term of employment set to begin January 1, 2011, Greenberg argues the Employment Agreement was not capable of being performed within one year from its making.

The court agrees. Rullan does not contest the agreement's "making" was in early December 2010. Rather, he argues the amended complaint merely alleges he agreed to start *full-time* in January 2011, but the one-year term began in December 2010. (Pl.'s Opp 5, ECF No. 45.) This strained reading of the amended complaint is contradicted by Rullan's own meeting minutes, which state he would begin "officially" working in January for a one-year term.[5] It is further contradicted by a reference in the amended complaint to "Rullan's 2011 salary," (Am. Compl. ¶ 40), which would plainly exclude work done in 2010, and a reference to Rullan's "$72,000 annual salary to work at the Camp full-time," (*Id.* ¶ 39), which makes clear the one-year work term referred to full-time employment only. Rullan's argument that the one-year employment term began on the date of the agreement is therefore not plausible. Accordingly,

---

[5] Because Rullan does not argue that either Goden or Greenberg signed the meeting minutes, the minutes do not bring the oral employment agreement outside the statute of frauds.

claims based on the oral employment agreement are barred by the statute of frauds.

### 2.   The Partnership and Stock Agreement

Rullan alleges he, Goden, and Greenberg entered into the written Partnership and Stock Agreement in West Virginia on August 24, 2011.  (Am. Compl. ¶¶ 66-68).  Greenberg argues (1) the agreement is an unenforceable statement of intent; and (2) assuming *arguendo* the agreement is enforceable, it makes no representations as to the financial state of the corporations, and the parol evidence rule would bar the introduction of extrinsic evidence as to any such representations.

"The fundamentals of a legal contract are competent parties, legal subject-matter, valuable consideration, and mutual assent.  There can be no contract if any of these elements are lacking."  *Virginian Exp. Coal Co. v. Rowland Land Co.*, 131 S.E. 253, 262 (W. Va. 1926).  "The question as to whether a contract is ambiguous is a question of law to be determined by the court."  Syl. pt. 4, *Dan's Carworld, LLC v. Serian*, 677 S.E.2d 914, 915 (W. Va. 2009).

Because this action has been stayed to the extent it seeks relief from Goden, and Rullan does not argue Greenberg agreed to be his partner, the alleged breach of the portions of the Partnership and Stock Agreement concerning a partnership between Goden and Rullan are not now before the court.  Rather, Rullan alleges Greenberg breached the agreement by "repudiating the sale of stock in TRI and YWL to Rullan despite his fronting a substantial portion of his equity contributions, both in cash and in the form of sweat equity, ahead of schedule; attempting to convert Rullan's equity contribution into unsecured, zero interest debt in bad faith and without Rullan's permission or agreement; refusing to tender stock certificates in YWL and TRI despite Rullan's continuing demands; and refusing two payments of $25,000 each from Rullan as

payment for Greenberg's stock in the Camp (YWL and TRI)."  (Am. Compl. ¶ 122.)

Greenberg argues the Partnership and Stock Agreement is not an enforceable contract because it a mere document of intent rather than a contract, as evidenced by the vagueness of its terms.  Greenberg points to a number of the agreement's provisions expressly leaving issues to be determined in the future, including (1) "a due diligence of the company and the additional legal papers required for the transaction"; (2) a future "relegat[ion]" of Greenberg "from his debt obligations related to the company"; (3) the assumption of Greenberg's personal guarantees in the company "[a]s soon as the market conditions allow"; and (4) "the future . . . develop[ment] of a procedure to set the way that the partners will make decisions."  (Def.'s Mot. to Dismiss 10-11; Am. Compl. ¶ 68.)

Greenberg does not dispute that "parties can agree to agree in the future . . . ."  (Def.'s Mot. to Dismiss 11.)[6]  Rather, he argues several of the terms in the Partnership and Stock Agreement are so vague that they cannot support the mutual assent of the parties, and the initialed and signed document is therefore "nothing more than a non-binding document of intent."  (*Id*. at 12.)

The court disagrees.  The Partnership and Stock Agreement is not so vague as to destroy the mutual assent necessary to any enforceable contract.[7]  Greenberg has failed to cite West Virginia authority suggesting that where a contract sets out requirements for future action, that action must be described with a greater degree of specificity than exists here.  To the extent Greenberg argues he did not breach the agreement, that is a fact question the court may not

---

[6] Greenberg does not appear to argue the Partnership and Stock Agreement contained "condition[s] precedent to the efficacy of the contract."  *Hamon v. Akers*, 222 S.E.2d 822, 825 (W. Va. 1976).

[7] The parties have not provided the court with a copy of the Partnership and Stock Agreement, and the court reaches this conclusion on a motion to dismiss based only on the provisions of the agreement included in the complaint.  At the summary judgment stage, of course, the court will need to consider the agreement more carefully.

resolve here.  The court therefore will deny the motion to dismiss as to Count One's breach of

contract claim against Greenberg for his alleged breach of the Partnership and Stock Agreement.

### B.  Count Two: Negligence

Rullan argues Greenberg may be held liable for negligence against him under West

Virginia law.  Greenberg argues he owed Rullan no duty, and Rullan alleges no facts giving rise

to a tort.  In determining what body of law to apply in a tort case, Maryland follows the rule of

*lex loci delicti*, under which a court applies the law of the state where the last event constituting

the tort occurred.  *Erie Ins. Exch. v. Heffernan*, 925 A.2d 636, 648-49 (Md. 2007).  Because the

actions constituting the alleged torts in this case occurred in West Virginia, that state provides

the substantive law for these claims.

"[T]o establish a prima facie case of negligence in West Virginia, it must be shown that

the defendant has been guilty of some act or omission in violation of a duty owed to the

plaintiff."  Syl. pt. 1, *Parsley v. Gen. Motors Acceptance Corp.*, 280 S.E.2d 703, 704 (W. Va.

1981).  "The determination of whether a defendant in a particular case owes a duty to the

plaintiff . . . must be rendered by the court as a matter of law."  Syl. pt. 5, *Aikens v. Debow*, 541

S.E.2d 576, 578 (W. Va. 2000).  In limited circumstances, West Virginia "law allows a

negligence claim for purely economic losses when . . . there is evidence of a 'special

relationship' between the plaintiff and the defendant."  *White v. AAMG Const. Lending Ctr.*, 700

S.E.2d 791, 798 (W. Va. 2010) (quoting *Aikens*, 541 S.E.2d at 590 (2000).  *See also Eastern

Steel Constructors, Inc. v. City of Salem,* 549 S.E.2d 266, 272 (W. Va. 2001) ("[R]ecovery of

economic damages should be allowed in certain meritorious claims when an adequate barrier

against limitless liability, such as the existence of a special relationship, can be identified[.]").

"Such special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or other close nexus." *Aikens*, 541 S.E.2d at 589.

Rullan alleges Greenberg owed him a duty by accepting his money, representing he was Goden's partner, accepting his uncompensated labor, and entering into the Partnership and Stock Agreement with him.  (Am. Compl. ¶ 126.)  These allegations present a "special relationship" sufficient to give rise to a duty to exercise reasonable care concerning Rullan's monetary and labor contributions.  To the extent Rullan alleges Greenberg breached that duty by misappropriating Rullan's monetary contributions, economic harm to Rullan was foreseeable, and would constitute a breach.  Accordingly, Greenberg's motion to dismiss Rullan's negligence claim will be denied.

### C.  Count Three: Breach of Fiduciary Duty

Count Three alleges Greenberg owed and breached a fiduciary duty to Rullan.  Greenberg argues he neither owed nor breached a fiduciary duty to Rullan.

The Supreme Court of Appeals of West Virginia has "defined a fiduciary duty as a duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person," and has noted that "[i]t is the highest standard of duty implied by law." *Lucas v. Fairbanks Capital Corp.*, 618 S.E.2d 488, 493 (W. Va. 2005) (quotation marks, brackets, and citation omitted).  "[A]s a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship." *Elmore v. State Farm Mut. Auto. Ins. Co.*, 504 S.E.2d 893, 899 (W. Va. 1998).

Rullan asserts Greenberg owed him a fiduciary duty "by inducing him and his future wife to surrender their careers in Spain and work on behalf of and at the Camp; accepting Rullan's life savings of $105,000; accepting more than $100,000 in uncompensated labor from Rullan on behalf of the Camp (TRI and YWL); entering into the [Partnership and Stock] Agreement; inducing Rullan along with Goden to assume Greenberg's personal debts; and cultivating a personal relationship of trust and loyalty over many years akin to that of a close family member." (Am. Compl. ¶ 130.)  Rullan cites no authority to suggest any of these actions give rise to a fiduciary duty, and makes no allegations that Greenberg "actually accepted" the confidence Rullan alleges he placed in Greenberg.  Accordingly, the motion to dismiss the claimed breach of fiduciary duty will be granted as to Greenberg.

### D.  Count Five: Financial Accounting

Rullan's claim for a financial accounting is based on his alleged partnership with Goden, and is therefore stayed.

### E.  Count Six: Conversion of Property and Invasion of Privacy

Rullan alleges Greenberg converted Rullan's personal property by refusing to let him retrieve the belongings he had left at the Camp, returning only a portion of his belongings after he filed this suit and destroying or discarding the remainder, and denying him access to his Camp email account.  Greenberg responds Rullan does not identify any of the property still in Greenberg's possession, and the allegation regarding the email account is moot because, through discovery, Rullan was provided a disk containing the entire account.

Conversion is "[a]ny distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith . . . ."  Syl. pt. 17, *Rodgers v.*

*Rodgers*, 399 S.E.2d 664, 668 (W. Va. 1990).  Rullan alleges that after Goden and Greenberg sought to terminate his position with the Camp, he and his lawyer made "numerous requests" for Goden and Greenberg to return the personal property he had left "neatly packed in three sealed boxes in his cabin at [the] Camp," but Goden and Greenberg "refused" those requests.  (Am. Compl. ¶ 104.)  Rather, at some point after this suit was filed, Rullan's lawyer received one "unmarked box from High View, West Virginia" containing "only a portion of Rullan's personal items as well as other items, such as dirty laundry, which did not belong to him."  (*Id.* ¶ 105.) Rullan believes Goden and Greenberg "willfully and wantonly destroyed or discarded some of Rullan's personal possessions in retaliation for Rullan filing this lawsuit."  (*Id.*)

Rullan has not adequately alleged a conversion claim regarding the personal property he left at the Camp, at least some of which has been returned to him, because he makes no attempt to describe that property.  A conclusory allegation that Greenberg failed to return some unspecified personal property is insufficient to give rise to a claim for conversion, because it does not show to what "relief" Rullan is "entitled."  Fed. R. Civ. P. 8(a)(2).  Further, Rullan has failed to provide any authority supporting the allegation that he had a property interest in his work email account sufficient to give rise to a conversion claim. Accordingly, the motion to dismiss Count Six will be granted.[8]

### F.  Count Seven: Fraudulent Inducement

Rullan asserts three fraud claims: fraudulent inducement in Florida, fraudulent

---

[8] To the extent Rullan asserts a claim for invasion of privacy, he has failed to state a claim upon which relief can be granted.  "An 'invasion of privacy' includes (1) an unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public."  Syl. pt. 8, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 74 (W. Va. 1983).  Rullan makes no allegations that state a claim as to any of these categories.  The court will therefore dismiss his invasion of privacy claim.

inducement in West Virginia, and fraud in Maryland.  Greenberg argues Rullan has failed to plead these claims with particularity in accordance with Federal Rule of Civil Procedure 9(b). Rule 9(b) "requires a plaintiff to plead 'with particularity the circumstances constituting fraud.'" *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (quoting Fed. R. Civ. P. 9(b)).  These "circumstances include the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (citation and internal quotation marks omitted).  *See also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Because the court has determined that the Employment Agreement is unenforceable under Florida's statute of frauds, Rullan's claim that he was fraudulently induced into entering that agreement also fails, and will be dismissed.  Further, Rullan's allegations concerning fraud in Maryland concern only Goden, and that portion of this action has been stayed.  The court therefore will assess only Rullan's fraudulent inducement claim as to the Partnership and Stock Agreement.[9]

"Generally speaking, '[f]raud has been defined as including all acts, omissions, and concealments which involve a breach of legal duty, trust or confidence justly reposed, and which are injurious to another, or by which undue and unconscientious advantage is taken of another.'" *Kessel v. Leavitt*, 511 S.E.2d 720, 752 (W. Va. 1998) (citation omitted).  In West Virginia, "[t]he essential elements in an action for fraud are: '(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; [3] that plaintiff relied upon it and was justified under the circumstances in relying upon it; and [4] that he was damaged because he relied upon it.'"  Syl. pt. 1, *Lengyel v. Lint*, 280 S.E.2d 66, 67 (W. Va. 1981) (citation

---

[9] Because the actions constituting the alleged tort took place in West Virginia, that state's law applies.  *See Erie Ins. Exch*, 925 A.2d at 648-49.

omitted).  "The critical element of a fraudulent inducement claim is an oral promise that is used as an improper enticement to the consummation of another agreement."  *Traders Bank v. Dils*, 704 S.E.2d 691, 696 (W. Va. 2010).

The relevant agreement here is the Partnership and Stock Agreement, entered into on August 24, 2011.  The vast majority of Rullan's fraudulent inducement claim as to this agreement concerns Goden's statements surrounding her alleged partnership with Rullan.  Rullan has, however, also put forth two allegations of fraud based on Greenberg's statements that meet Rule 9(b)'s heightened pleading requirements.  First, Rullan alleges that on June 4, 2011, between 10:00 a.m. and 2:00 p.m. at Goden's house at the Camp, in the context of a discussion "on how to transfer Greenberg's full equity stake in the Camp to Rullan," Greenberg "represented to Rullan that he was Goden's full partner in the Camp . . . ."  (Am. Compl. ¶ 55.) Second, and similarly, Rullan alleges that on August 15 and 18, 2011, in the Camp's office, again in the context of discussions addressing "Rullan's assumption of Greenberg's full equity stake in the Camp," Greenberg "again represented to Rullan that he and Goden were full partners and co-owners of the Camp . . . , and that Goden and Rullan shared equal fiscal responsibility for the Camp."  (*Id.* ¶ 65.)  Rullan alleges he "relied upon these representations" in entering into the Partnership and Stock Agreement, and, among other things, in contributing additional money to the Camp and "working many months without any pay . . . ."  (*Id.* ¶ 142.)  That is enough to satisfy Rule 9(b).[10]

Greenberg argues in the alternative that Rullan's fraudulent inducement claim must fail because the Partnership and Stock Agreement did not "speak to warranties and representations . .

---

[10] The reasonableness of this reliance is hard to assess, particularly without a copy of the agreement, but Rullan's allegations suffice at this stage.

. .” (Def.'s Mot. to Dismiss 19.)  But "[t]he fact that [an] agreement is reduced to writing, as it was in this case, does not negate the occurrence of a precedent oral promise that was the motivating factor for the making of such agreement."  *Traders Bank*, 704 S.E.2d at 696.  The "precedent oral promise[s]" here are Greenberg's assurances that Rullan was Goden's partner, and Greenberg's statement that Rullan shared equal fiscal responsibility for the Camp with Goden.  Rullan alleges these statements were motivating factors for his decision to enter the Partnership and Stock Agreement.  Greenberg's alternative argument is therefore unconvincing.

Accordingly, the court will deny Greenberg's motion to dismiss Rullan's claim that Greenberg fraudulently induced him to enter the Partnership and Stock Agreement.

### G.  Count Eight: Shareholder Oppression

Rullan alleges shareholder oppression under West Virginia law as to TRI,[11] and under Maryland law as to YWL and YWI.  Greenberg responds Rullan was never a shareholder in TRI or YWL, YWI was formed for Rullan's benefit, and the dissolution Rullan seeks is not supported by law.

#### 1.   Shareholder Oppression as to TRI

West Virginia recognizes an "oppressive conduct exception to the general rule that a corporation has complete control of its affairs."  *State ex rel. Smith v. Evans*, 547 S.E.2d 278, 283 (W. Va. 2001).  This cause of action stems from West Virginia Code § 31D-14-1430(2)(B), which authorizes a circuit court to dissolve a corporation in a proceeding by a shareholder if it is established that the "directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent."  Courts may apply a number of alternatives to dissolution, however, including an award of damages.  *State ex rel. Smith*, 547

---

[11] Rullan also alleges shareholder oppression as to the Camp itself.  Because the Camp is not a corporate entity, this allegation will be dismissed.

S.E.2d at 283-84.

Oppressive conduct is tied to a violation of fiduciary duty.  "While the officers and directors of a business corporation are accorded a rather broad latitude in the conduct of the affairs of the corporation, they occupy a fiduciary relationship toward it and its shareholders. The same fiduciary relationship exists on the part of the majority shareholders of a business corporation toward its minority shareholders."  Syl. pt. 2, *Masinter v. WEBCO Co.*, 262 S.E.2d 433, 435 (W. Va. 1980).  "A violation of the fiduciary relationship may result from oppressive conduct, which is conduct that departs from the standards of good faith and fair dealing which are inherent in the concept of a fiduciary relationship."  *Id.* at syl. pt. 3.  "An attempt to 'freeze or squeeze out' a minority shareholder from deriving any benefit from his investment in a private business corporation, without any legitimate business purpose, may constitute oppressive conduct."  *Id.* at syl. pt. 4.

As a threshold matter, Rullan has adequately alleged he was a shareholder of TRI, and has supported this allegation with the content of two faxes he alleges Goden sent him confirming his purchase of stock in YWL and TRI.  (Am. Compl. ¶¶ 74-75.)  As to Rullan's substantive allegations, Rullan has alleged a range of bad faith conduct (including that he was required to work for many months without pay under the expectation that this work would be converted into "sweat equity" such that his ownership share of TRI would increase), culminating in his purported "firing" by both Greenberg and Goden.  Though the allegations as to Greenberg specifically are somewhat difficult to parse from the long list Rullan has set out, Rullan has alleged enough against Greenberg to survive a motion to dismiss.[12]

### 2.  Shareholder oppression as to YWL and YWI

---

[12] This analysis is distinct from that of Count Three's fiduciary duty claim.

Maryland also recognizes a cause of action for shareholder oppression.  *Edenbaum v. Schwarcz-Osztreicherne*, 885 A.2d 365, 377-79 (Md. 2005).  This cause of action stems from a statute authorizing a stockholder to petition a court to dissolve a corporation on the grounds that the "acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent."  Md. Code Ann., Corps. & Ass'ns § 3-413(b)(2).  Oppressive conduct includes "'conduct that substantially defeats the "reasonable expectations" held by minority shareholders in committing their capital to the particular enterprise.'"  *Edenbaum*, 885 A.2d at 378 (citation omitted).  Conduct is not oppressive, however, unless these defeated reasonable expectations were both reasonable under the circumstances and central to the aggrieved party's decision to join the venture.  *Id*. at 379.

Rullan's allegations concerning YWI relate entirely to Goden.  As to YWL, however, the bad faith conduct Rullan alleges Greenberg engaged in (which is the same as the conduct alleged under the TRI claim) would be contrary to the reasonable expectations of any minority shareholder.  This claim therefore survives for substantially the same reasons as the claim as to TRI.[13]

---

[13] The court feels obligated to note its dismay at the parties' approach to litigating this case.  Counsel for both parties have engaged in unprofessional ad hominem attacks, and have failed to work constructively to resolve discovery disputes without filing unnecessary motions.  Judge Gesner's efficient handling of these disputes is much appreciated.

**CONCLUSION**

For the reasons stated above, the court will grant the motion to join TRI, YWL, and YWI,

deny the motion to join the Camp itself, deny the motion to strike, grant the motion to amend,

and grant in part and deny in part the motion to dismiss.

A separate order follows.


September 30, 2014                                              /s/
Date                                              Catherine C. Blake
                                                  United States District Judge