## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LUIS RULLAN                          :
                                       :
                                       :
      v.                         :     Civil No. CCB-12-2412
                                         :
                                         :
JILL GODEN, *et al.*                  :
                                         :

## MEMORANDUM

This contentious diversity case centers on a West Virginia summer camp and the failed professional and personal relationships between plaintiff Luis Rullan, a Spanish national, and defendants Jill Goden and her father, Fred Greenberg.  Now before the court are (1) Greenberg's motion for partial summary judgment; (2) Goden's motion for partial summary judgment; (3) Rullan's cross-motion for partial summary judgment as to Greenberg; and (4) Rullan's cross-motion for partial summary judgment as to Goden.  The issues have been fully briefed, and no hearing is necessary.  *See* Local R. 105.6 (D. Md. 2014).  For the reasons stated below, Greenberg's motion will be denied; Goden's motion will be granted in part and denied in part; and Rullan's motions will be denied.

## BACKGROUND

In 1955, Greenberg founded a summer camp called Camp White Mountain on 70.5 acres in High View, West Virginia.  (Greenberg Decl. ¶ 1, Greenberg Reply Mot. Summ. J. Ex. 3, ECF No. 232-3; 2010 Camp Appraisal, Pl.'s Opp'n Goden Mot. Summ. J. Ex. 1, ECF No. 207-1).  Greenberg also owned and operated (and ultimately sold) several other camps over the years.  (Greenberg Decl. ¶ 1; Greenberg Dep. 42, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 15, ECF

No. 206-15.)  Camp White Mountain was later renamed Timber Ridge Camp ("the Camp").
(Greenberg Decl. ¶ 1.)  As of 2010, Greenberg and Goden each held a 50% stake in the two
entities that owned and managed the Camp: Timber Ridge, Inc. ("TRI") and Youth World, Ltd.
("YWL").  (Greenberg Decl. ¶¶ 2-3.)

Rullan began attending the Camp in 1990 at the age of six, and continued attending every
summer for the next ten years.  (Rullan Decl. ¶ 1, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 62,
ECF No. 208-43; Greenberg Decl. ¶ 8.)  He also served as a counselor at the Camp, and his four
siblings attended the Camp as both campers and counselors over a period of about 20 years.
(Rullan Decl. ¶ 1; Greenberg Decl. ¶ 8; Greenberg Dep. 16.)  During this time, Rullan and his
family became very close friends with Greenberg and Goden.  (Rullan Decl. ¶ 2; Greenberg
Decl. ¶ 9.)  Indeed, Rullan viewed Goden "like [a] mother" and Greenberg "like [a] grandfather."
(Rullan Dep. 269-70, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 17, ECF No. 206-17.)  From
either 2004 to 2010 (according to Rullan) or 2006 to 2010 (according to Greenberg and Goden),
Rullan, like other former campers, helped recruit children to attend the Camp, and received a
modest commission for each camper he recruited.  (Rullan Decl. ¶ 1; Greenberg Decl. ¶ 10.)

Around 2010, Greenberg decided to "get out of the Camp business . . . ."  (Greenberg
Decl. ¶ 5.)  He believed Goden "was capable of running the Camp" but that she "could not
manage the Camp alone and needed help[.]"  (*Id.* ¶ 6.)  In early 2010, Greenberg met with Larry
Phillips, a friend of his and a successful businessman.  (*Id.* ¶ 7.)  Phillips suggested that the
Camp "move . . . in a new direction by adding a European partner" who was "relatively wealthy"
and "could capitalize the business because . . . Goden could not be the only one contributing
money to keep the business afloat."  (*Id.*)  Greenberg decided to take this advice, and in

November 2010 he says he called Rullan, who he believed came from a wealthy Spanish family. (*Id.* ¶¶ 7, 9.)

Rullan recalls that he "talked with Goden and exchanged emails with Goden and perhaps Greenberg" during November 2010, (Rullan Decl. ¶ 3), and though "[m]ost of [his] communications in writing and by telephone were with Goden, [he] did speak with Greenberg as well," (*id.* ¶ 4). He says that Goden and Greenberg told him "that Greenberg was getting older, that he could no longer keep running the Camp with Goden, and that they wanted to find a partner for Goden to help manage the Camp." (*Id.*) He says they "proposed that [Rullan] become Goden's partner to help her manage [the Camp] and to assist with recruiting campers from Europe." (*Id.*) An email exchange between Rullan and Goden on November 3, 2010, shows that they had discussed the possibility of forming a partnership, with Rullan writing "let's talk about the possibility of beeing [sic] partners," and Goden responding "[t]his could be an amazing partnership." (2010 Goden/Rullan Emails PL 00780, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 25, ECF No. 208-6.) Rullan also says Greenberg and Goden informed him "that the Camp had hundreds of acres of land, and that the Camp's debt was limited to a mortgage of approximately $500,000, as shown on a copy of a 2009 tax return for [TRI] that [they] provided." (Rullan Decl. ¶ 4.)

Rullan and his father met with Goden and Greenberg at the St. Andrews Club House in St. Andrews, Florida, on December 7 and 8, 2010, to discuss Rullan's possible involvement in the Camp's business as an employee and/or partner. (*Id.* ¶ 5; Greenberg Decl. ¶ 12.) Rullan prepared a PowerPoint presentation based in part on the information Goden and Greenberg had provided him, and he presented it to Goden and Greenberg on December 7. (Rullan Decl. ¶ 5;

Greenberg Decl. ¶ 13; PowerPoint Presentation, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 43,

ECF No. 208-24.)  The presentation included certain information on Rullan's understanding of

the Camp's liabilities, including a $518,236 mortgage.  (PowerPoint Presentation 21, 22.)[1]  But

the Camp's liabilities were actually much higher, as evidenced by an April 2010 note in favor of

Capon Valley Bank for a $2.425 million loan to Greenberg, his wife, Goden, and TRI, and

secured by a deed of trust on the Camp, that consolidated existing debt related to the Camp.

(Capon Note, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 6, ECF No. 206-6.)  Neither Goden nor

Greenberg corrected Rullan's misunderstanding.  (Rullan Decl. ¶ 7; Greenberg Decl. ¶ 13.)

　　　The parties disagree as to much of what was discussed at this meeting.  Rullan says

Greenberg "stated that he authorized Goden to make [Rullan] her partner if she wished and, if so,

that Greenberg would sell his share of the Camp to [him]."  (Rullan Decl. ¶ 8.)  Rullan also says

the parties reached an oral employment agreement under which Rullan would recruit European

campers and help Goden manage the business in exchange for an annual salary of $72,000.  (*Id.*

¶¶ 8-11.)  Rullan drafted a document titled "Minutes meeting December 7, 2010 – St. Andrews"

and emailed it to Goden.  (*Id.* ¶ 12.)  That document stated that Rullan "will be working as an

employee for one year (starting officially in January)."  (St. Andrews Minutes 1, Pl.'s Opp'n

Greenberg Mot. Summ. J. Ex. 49, ECF No. 208-30.)  The document stated Rullan would spend

six months "based in Barcelona and traveling to capture all the international campers possible,"

and for six months he would "be in charge of the operation of the camp with [Goden], from May

to October."  (*Id.*)  It stated that "[a]fter year one there will be a meeting to evaluate the year and

see the results obtained as well as setting the partnership agreement that better suits everyone's

---

[1]　　　Confusingly, Greenberg says that this sum is "actually the combined second mortgages" on his homes in Florida in Maryland "that were taken out . . . to provide short-term money to cover the Camp's business expenses." (Greenberg Decl. ¶ 29.)

needs." (*Id.*)  It also stated that "[i]f everything goes well the idea is [for Rullan] to obtain shares

of the company," and that Rullan would "have to invest [i]n the company," and the amount of

this investment would "be set after year one." (*Id.* at 1-2.)  In addition, it stated that Rullan and

Goden would each pay $5,000 to pay an immigration lawyer to help him get a visa, and that

Rullan would have to pay $10,000 towards the creation of a new company.  (*Id.* at 2.)

 Greenberg and Goden dispute that an employment agreement was reached.  Instead, they

say they told Rullan he would make about $70,000 in commissions if he recruited 80 new

campers per year.  (Greenberg Decl. ¶ 14.)  They say they also told him he could "attend the

Camp during the summer of 2011 to learn from Goden how to run the Camp business, to be the

liaison for the European campers he recruited, and to determine if he could work together with

Goden." (*Id.* ¶ 20.)  They also dispute that Greenberg made Goden his agent such that she could

enter into legal obligations on his behalf.  (*Id.* ¶ 19.)  Further, Greenberg says that he told Rullan

and his father it was important that Rullan work with Goden for at least a year before entering

into any partnership, and that "lawyers would need to be involved at the right time to provide for

a transaction to happen." (*Id.* ¶ 15.)  Greenberg agrees, however, that he asked Rullan about his

ability to purchase Greenberg's 50% interest in TRI and YWL at a later time, and to take on his

personal guarantees and financial liabilities relating to the companies.  (*Id.* ¶ 16.)  Greenberg

says Rullan and his father assured him that they had the money.  (*Id.* ¶ 17.)  Greenberg also says

that to give Rullan "an ego boost," the parties discussed "the creation of a recruiting company"

of which Rullan would have an equity interest.  (*Id.* ¶ 22.)

 Goden and Rullan started working together soon after the Florida meeting, (Rullan Decl.

¶ 15), and Goden began referring to Rullan as a "partner" just a few days after the meeting, (*see*

Partner Emails 1, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 27, ECF No. 208-8 ("I can not

express enough how excited I am to have you as my partner."); *id.* at 2 ("I have a new European

partner, Luis Rullan.").)   Rullan says Goden "started to complain to [him] about Greenberg's

financial demands on the Camp's funds and resources."  (Rullan Decl. ¶ 16.)  According to

Rullan, Greenberg's wife limited his access to their substantial wealth, and Greenberg

"constantly asked Goden to borrow money."  (*Id.*)  Rullan says Goden "wanted [Rullan] to

assume Greenberg's ownership share of the Camp, so that Goden and [Rullan] would run the

Camp together as partners."  (*Id.*)

On December 21, 2010, Goden retained an immigration attorney named Richard

Gershberg to help Rullan get a U.S. visa.  (*Id.* ¶ 21; Gershberg Representation Agreement, Pl.'s

Opp'n Greenberg Mot. Summ. J. Ex. 37, ECF No. 208-18.)  On January 6, 2011, Gershberg

signed the articles of incorporation for a new corporation called Youth World International, Ltd.

("YWI") that would help Rullan get an E-2 visa.[2]  (YWI Corporate Documents PL 00569, Pl.'s

Opp'n Greenberg Mot. Summ. J. Ex. 59, ECF No. 208-40.)

On January 29, 2011, Greenberg executed a promissory note recognizing that he had

borrowed $350,000 from his friend, Phillips.  (Promissory Note, Pl.'s Opp'n Greenberg Mot.

Summ. J. Ex. 44, ECF No. 208-25.)  Greenberg says, however, that he actually borrowed the

money in 2009, and the promissory note merely documented this prior loan.  (Greenberg Decl. ¶

30.)  Rullan says he would not have continued to pursue the business venture had he known of

this liability, unrelated lawsuits against the defendants and the Camp, the Camp's cash flow

issues, the actual acreage of the Camp, the extent of the defendants' commingling of funds, or

---

[2]        The "E-2 Treaty Investor" non-immigrant visa allows a non-citizen to be admitted to the United States
"solely to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he
is actively in the process of investing, a substantial amount of capital."  8 U.S.C. § 1101(a)(15)(E)(2).

that Goden "apparently had no intention of allowing [Rullan] to co-manage the Camp or to act as

her full partner . . . ." (Rullan Decl. ¶ 14, 17.)

Rullan says that while he and Goden were traveling together on Camp business towards

the end of February 2011, they "agreed to become full partners rather than wait until the end of

the year." (Rullan Decl. ¶ 18.) Rullan says he "accepted Goden's offer to become her partner

and to buy Greenberg's share of the Camp." (*Id*.) He says that under this agreement, Goden and

Rullan would each receive a salary of between $72,000 and $100,000 and they would split the

cost of an immigration lawyer to help Rullan get a U.S. visa. (*Id.*) He says they agreed to put

the agreement in writing when he arrived at the Camp that summer. (*Id*.)

On March 30, 2011, Goden and Rullan executed a stock purchase agreement under which

each purchased 500 shares of YWI. (YWI Corporate Documents PL 00641-45.) Under that

agreement, Goden and Rullan would each pay $5,000 for the shares, and Rullan would

contribute an additional $50,000 "as a loan" to be repaid over eight years. (*Id.* at PL 00642-43.)

Rullan says, however, that Goden told him that Gershberg suggested that Goden and Rullan

"each contribute $55,000 in capital" to YWI, but that Goden contributed nothing. (Rullan Decl.

¶ 23.) Rullan had already wired the money to YWI on March 17, 2011. (La Caixa Transfers to

YWI, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 38, ECF No. 208-19.) Goden became president

and treasurer of YWI, and Rullan became its vice president and secretary. (YWI Corporate

Documents PL 00629; Rullan Decl. ¶ 24.) A few days after the stock purchase agreement,

Goden told Rullan she needed to "borrow" the $55,000 he deposited to pay the Camp's bills.

(Rullan Decl. ¶ 25.) Rullan says Goden told him she would return the money shortly, but never

did. (*Id.*) Goden and Greenberg continued to use the YWI bank account to process the

payments of European campers, however, as well as to provide Rullan with periodic payments. (*Id.*)

Rullan spent the summer of 2011 at the Camp.  Greenberg says, however, that Rullan "did not demonstrate . . . that he was ready or capable to run and manage the day to day activities of the Camp."  (Greenberg Decl. ¶ 37.)  For example, Greenberg says Rullan favored European campers over American ones, "came off as pompous" to some of the campers' parents on visitor's day, and refused to do the often menial labor that was sometimes necessary to run the Camp.  (*Id.* ¶¶ 37, 38.)

Starting in May 2011, Rullan says he "began to learn about the Camp['s] business," including that two separate entities, YWL and TRI, were involved in the ownership and management of the Camp, and that Camp bills were sometimes paid late.  (Rullan Decl. ¶ 29.) On June 4, 2011, Rullan says he, Greenberg, and Goden met at Goden's house at the Camp to "discuss committing [his] partnership agreement with Goden into writing and to identify any outstanding issues about [their] partnership."  (*Id.* ¶ 30.)  He says that during this meeting, Goden and Greenberg "continued to refer to [him] as Goden's full partner in the Camp."  (*Id.*) Rullan says Goden told him the Camp had enough money to pay them each a salary of between $72,000 and $100,000 per year, and neither Greenberg nor Goden disclosed to him the extent of the Camp's liabilities.  (*Id.* ¶¶ 30, 31.)

On July 21, 2011, Greenberg wrote Goden an email addressing the state of the Camp.  In that email, Greenberg wrote that Goden should

> let [Luis] do what ever he can in Europe while we fill up from our areas.
> What we need from him is a large infusion of money to reduce your debt
> payments and that is not a lot to ask of him. . . .  I feel that with Rullan[']s
> money for debt relief and better recruiting we can do it and the longer it

> take[s] for [Luis] to do his thing the more expensive Camp becomes for
> him.

(July 2011 Greenberg Email, Pl.'s Opp'n Greenbeg Mot. Summ. J. Ex. 26, ECF No. 208-7

(changed from all caps in original).)

On August 8, 2011, Rullan says Goden asked him to lend $50,000 to the Camp to cover a

cash flow shortage.  (Rullan Decl. ¶ 32.)  Rullan says Goden told him that as her full partner and

co-owner of the Camp, he had co-equal financial responsibility for the Camp.  (*Id*.)  Rullan says

he relied on this statement and wired $50,000, the remainder of his life savings, to YWL the next

day.  (*Id*.)

Greenberg says that in August 2011, "Rullan became increasingly concerned" that

Greenberg would not sell him his interest in the Camp because of his "failure to recruit enough

European campers and his poor performance at the Camp that summer."  (*Id*. ¶ 39.)  He says

Rullan "was adamant about having a letter of intent that he would have the opportunity to

purchase [Greenberg's] interest in the Camp the next spring."  (*Id*. ¶ 40.)  Greenberg says he told

Rullan that formalizing an agreement "would take years" and "attorneys would need to handle

any contract . . . ."  (*Id*.)  Nevertheless, on August 18, 2011, Greenberg says Rullan presented

him and Goden with a set of proposed terms to a deal to purchase his interest in the Camp.  (*Id*. ¶

41.)  Greenberg says he "did not want to sign" it and "walked out of the meeting" because,

among other things, Rullan "had not even completed the one year vetting period[.]"  (*Id*. ¶ 42.)

On August 24, however, Greenberg, Goden, and Rullan all agreed to sign a document titled

"Partnership agreement August 24th, 2011 – Timber Ridge Camp, HV, WVA."  (*Id*. ¶ 43;

Partnership and Stock Agreement, Greenberg Mot. Partial Summ. J. Ex. V, ECF No. 189-22.)

Greenberg says all parties understood the document to be nothing more than a letter of intent.

(*Id.*)

Rullan has a different understanding.  He says that in the afternoon and evenings of

August 15 and 18, 2011, he met with Greenberg and Goden to discuss issues regarding the

partnership and Rullan's purchase of Greenberg's stake in YWL and TRI.  (Rullan Decl. ¶ 35.)

He says that Greenberg and Goden both referred to him as Goden's partner during these

meetings.  (*Id.*)

It is undisputed, however, that on August 22, 2011, Goden wrote Gershberg an email

stating as follows: "I will call you later as he is buying 1/2 of this company, Timber Ridge for

500,000. The agreement is being finalized now.  It is being paid at a rate of $50,000 a year for 10

years."  (August 2011 Goden Emails to Gershberg 2, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex.

34, ECF No. 208-15.)  The next day, she wrote another email to Gershberg stating as follows: "I

am going to have Luis send you the document that is about to be signed.  It is a buy out of my

father's stock for $500,000.  He is paying him 50,000 over the next ten years."  (*Id.* at 1.)

On August 24, 2011, Rullan says that he, Greenberg, and Goden together drafted the

partnership and stock agreement ("PSA"), and Rullan typed it while Goden and Greenberg sat

next to him.  (Rullan Decl. ¶ 36.)  Rullan says his father and wife were both present while he,

Goden, and Greenberg discussed the agreement.  (*Id.*)  That two-page document provided that

"Fred Greenberg, Jill Goden and Luis Rullan, agree to the following:"[3]

- Fred Greenberg as the founder of Timber Ridge he will always have the recognition from Luis Rullan.  His thoughts and ideas to improve the business will be always taking into consideration and will always be welcome.
- At this point Fred Greenberg, owns 50% of the stock in the company "Youth World LTD T/A Timber Ridge Camps" and Jill Goden owns the

---

[3]     Rullan is not a native speaker of English, and the agreement contains various typographical and grammatical errors.  The court reproduces the agreement as it was drafted.

10

remaining 50%.  Jill Goden also owns 50% of Timber Ridge Inc. and Fred Greenberg owns the remaining 50% of Timber Ridge Inc.

- Fred Greenberg sells to Luis Rullan 50% of the total stock of both companies, 50% of Youth World LTD and 50% of Timber ridge Inc. That will be paid as per 50,000 USD per year during a 10 year period (starting 2011) for a total amount of 500,000 USD.

- If Fred dies before the obligation is finished, the obligation remains to whom he decides.

- There is the intention of pay 2 times per year during the total period of the agreement (10years starting 2011).  One in January and the second one in July.

- We agreed that we will set an equal salary between Jill Goden and Luis Rullan.

- Jill Goden and Luis Rullan will relegate Fred Greenberg from his debt obligations related to the company (Youth World LTD.)

- As soon as the market conditions allow it, without an extra cost for the company, Jill Goden and Luis Rullan will assume Fred Greenberg's personal guaranties in the company.

- Both partners will have the first right of refusal in the case that a partner has the intention to sell any of their stock.

- When the stock is to be transferred to a family member (only son or daughter of a partner) of any of the stockholders it is only allowed to transfer 49% of the stock.  The remaining 1% will be transferred to the other stockholder.

- Decisions will be made by mutual agreement between Jill Goden and Luis Rullan.

- In the future we will develop a procedure to set the way that the partners will make decisions.

- Any investment or expense for the company for over $ 5,000 has to have Jill Goden and Luis Rullan approval.

- In the case of missing a payment without an agreed solution from the partners, Luis Rullan will not have the right to the remaining percentage of the stock in the company.  In case of a default, Luis Rullan will not have the right to the stock in the company, he will only have the right to what the company owes him up to that point.

- Up to date, 50,000 USD out of the 55,000 USD that Luis Rullan deposit in Youth World International LTD are considered as the payment of the first 5% of the total stock of Youth World LTD and the 5% of the total stock of Timber Ridge Inc. bought to Fred Greenberg.

- In case of a profit, before returning money to the partners, 50% will go to reduce the debt, 25% for capital improvements and the remaining 25% will be decided by Jill Goden and Luis Rullan.

- If the company shows a profit or if it is able to pay, Youth World LTD, will transfer Fred Greenberg until 2020 (included), a fixed quantity of $ 19,000 the first month of the year in order for him to pay his car ($

8,000), phone ($ 4,200) and medical insurance ($ 8,800) bills for the whole year.  No other compensation will be given to him besides the one above mentioned ($ 19,000).  If he exceeds the quantity agreed he will take care of the remaining amount personally.  Anything related to this matter he will have to discuss with Luis Rullan.

- We will come up with a solution that we agreed with the accountant and lawyer to see if its better to pay Fred's expenses out of the first $25,000 USD paid the first month of the year.
- After this agreement, a due diligence of the company and the additional legal papers required for the transaction will be made.

(*Id.*)  The PSA was signed by Goden, Greenberg, and Rullan, each of whom also appear to have initialed both of its pages.  (*Id.*)

Rullan says he would not have entered into the PSA had he known the Camp's true financial situation.  (Rullan Decl. ¶ 40.)  He also says that Goden "agreed she would hire an attorney to execute additional legal documents, such as transferring and registering stock certificates," but though they "both briefly spoke to an attorney by phone, Goden never hired one."  (*Id.* ¶ 41.)

On October 27, 2011, Rullan sent Goden an email with two attached documents, each purportedly certifying his purchase of stock in TRI and YWL.  (*See* Stock Transfer Certification Emails, Greenberg Reply Ex. OO, ECF No. 233-4; Stock Transfer Certification, Pl.'s Opp'n Greenbeg Mot. Summ. J. Ex. 53, ECF No. 208-34.)  In that email, Rullan said he "just spoke to [his] 'Tax advisor'" who recommended that Rullan have some record that his $105,000 in wire transfers to the United States were used to purchase stock in TRI and YWL.  (Stock Transfer Certification Emails.)  Goden signed and faxed the two documents to Rullan.  (*See* Stock Transfer Certification.)[4]

---

[4]       The parties dispute the circumstances under which Goden signed these documents, and even offer competing translations of an exchange between Rullan and acquaintances of his concerning the relevance of the documents.  (*See* Greenberg Translation, Greenberg Reply Ex. VV, ECF No. 233-11; Rullan Translation, Rullan

The parties' relationship appears to have started to deteriorate in late 2011. In a long email Goden sent to Rullan on December 2, 2011, Goden wrote, "I know you gave the business 105,000.00. . . . You gave the business 105,000.00 towards the purchase of this camp. In May this contract either needs to be signed with an agreement we can both live with or you may want your money back and walk away." (December 2011 Goden Email, Greenberg Mot. Summ. J. Ex. AA, ECF No. 189-27.) Rullan says Goden made it difficult for him to work as a partner and shareholder by, among other things, preventing him from implementing a business plan to cut costs and from accessing the Camp's financial records. (Rullan Decl. ¶ 53.) When Goden hired new accountants, Rullan says she did not let him contact them, and Goden hired an unnecessary full-time staff member without consulting him. (*Id*. ¶¶ 57, 58.)

Rullan says that it wasn't until a January 2012 trip to the Camp's office in Reisterstown, Maryland that he learned of the Camp's 2010 appraised value of $2.9 million, which surprised him because he says Goden had told him it was worth $6 million. (*Id*. ¶¶ 42, 54.) Because of the $2.4 million loan, which Rullan says he also learned about at this time,[5] this meant that the amount of equity in the Camp was just $500,000, and Greenberg's share (for which Rullan believed he had just agreed to pay $500,000) was worth just $250,000. (*Id*.) He says he continued to learn about the Camp's financial problems, including commingling of funds by Goden, and the personal use by Goden and Greenberg of camp property. (*Id*. ¶¶ 55-56.)

In late 2011 and early 2012, Rullan says Goden "began to ask [him] for more money as the Camp experienced more cash shortfalls." (*Id*. ¶ 62.) When she learned, however, that Rullan

---

Reply to Greenberg Ex. 7, ECF No. 243-3.) The defendants say Goden was tricked into signing the documents because Rullan told her he needed them for his "legal problems." But the emails between Rullan and his acquaintances were sent after Goden had already signed and returned the documents. It is difficult to see how these emails establish any fraudulent intent on Rullan's part.

[5]      Rullan concedes that he may have learned of the loan as early as September 2011. (Rullan Decl. ¶ 44.)

13

had exhausted his savings and his family would not contribute, Goden grew agitated.  (*Id.*)

Greenberg's wife passed away in March 2012.  (Greenberg Decl. ¶ 71; Rullan Decl. ¶ 65.)

Rullan says Goden told him that as a result, Greenberg now had access to all their wealth.

(Rullan Decl. ¶ 66.)  Rullan believes that with this wealth, Greenberg wished to again involve

himself in Camp business.  (*Id*. ¶ 66.)  For his part, Greenberg says that "Rullan's ineptitude

caused the Camp to lose thousands of dollars and [Greenberg] was forced to infuse the [C]amp

with an additional $70,000 of [his] personal money" in 2012."  (Greenberg Decl. ¶ 74.)

In early May 2012, Rullan says he told Goden he wanted to keep about $40,000 in

deposits he had collected from European campers because he had amassed substantial personal

debt and had not been paid according to his expectations.  (Rullan Decl. ¶ 67.)  He says he

relented when Goden "became furious," but he demanded to know when he would be paid.  (*Id*.)

Rullan estimates he was paid a total of $27,500 from December 2010 through May 2012, and

received an additional $7,000 in legal services from Gershberg.  (*Id*. ¶ 26.)  He believes that the

remainder of the money he says he is owed from his work constitutes an additional contribution

towards the purchase of YWL and TRI through "sweat equity."  (*Id*. ¶ 27.)

On May 7, 2012, Greenberg says he called Rullan and asked him to send "all of the

materials and documents concerning the St. Andrews meeting and the [PSA]."  (Greenberg Decl.

¶ 76.)  On May 8, 2012, Greenberg sent Rullan a long email expressing dissatisfaction with the

number of European campers Rullan had managed to recruit and purporting to give Rullan the

option of walking away from their "contractual concept."  (May 2012 Greenberg Emails PL

00902-03, Pl.'s Opp'n Greenbeg Mot. Summ. J. Ex. 32, ECF No. 208-13.)  Greenberg also wrote

that "[w]e felt that the financial status of the Rullan family would have been sufficient to allow

them to assume their share of the debt service." (*Id.*)  Greenberg purported to offer Rullan the

opportunity to "decide whether . . . to continue with the project or . . . to bring it to a conclusion."

(*Id.*)  On May 17, 2012, Rullan wrote an email to Goden stating that Greenberg "insists that what

we have is a Letter of Intentions," but that it was, in fact, a contract.  (May 17 and 20 Emails,

Pl.'s Opp'n Greenbeg Mot. Summ. J. Ex. 31, ECF No. 208-12.)  On May 20, 2012, Goden told

Rullan that if he "show[ed] up" at the Camp he would be "escorted off [the] property by [a]

sheriff," and warned him that it would "be ugly." (*Id.*)  On May 21, 2012, Greenberg sent

another email to Rullan, this time stating that "there is not a position for [Rullan] at Timber

Ridge and [Greenberg] can not allow [Rullan] to be physically on the camp grounds."  (May

2012 Greenberg Emails PL 00904.)

      Rullan filed this lawsuit on August 14, 2012, and an extraordinarily contentious litigation

ensued, with the parties unable to agree even on language to include in a joint status report.

YWL, TRI, and YWI have since been added as defendants, and Goden has since filed for

bankruptcy.[6]  As a result, the case was stayed as to her when the court largely denied the

defendants' motion to dismiss.  After an unsuccessful settlement conference held on February

20, 2015, Greenberg and Goden filed motions for summary judgment.  Rullan opposed those

motions, and added cross-motions for summary judgment on his contract claims.  These motions

are now ripe for resolution.

## ANALYSIS

### I.  Summary Judgment Standard

---

[6]      Goden and Greenberg have since filed lawsuits to dissolve YWL and YWI.  The Camp is currently owned and operated by a corporation called Cacapon River Camps.  (Greenberg Dep. 253-54.)  Cacapon River Camps is owned by Eric Goden (Goden's husband) and Alex Reece (the Camp's former office manager).  (*Id.*)  Greenberg and Goden concede that the suits to dissolve YWL and YWI, and the transfer of YWI's assets and responsibilities to Cacapon River Camps, were "precautionary actions to protect themselves and the Camp" from Rullan's lawsuit. (Greenberg Reply 36.)

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 2003)).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). "In considering each motion, [the court must] 'resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing

  
that motion.'"  *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392-93 (4th Cir. 2014) (quoting *Rossignol*, 316 F.3d at 523).

## II.  Greenberg's Motion for Partial Summary Judgment

Greenberg seeks summary judgment on the following claims: (1) breach of the PSA; (2) fraudulent inducement to enter the PSA; (3) unjust enrichment; and (4) shareholder oppression.[7]

### A.  Breach of Contract

The parties correctly agree that West Virginia law governs Rullan's claim for breach of the PSA.[8]  Greenberg raises the following arguments in support of his motion for summary judgment based on his alleged breach of this agreement: (1) the agreement is an unenforceable letter of intent; (2) the agreement is unenforceable because it does not provide financial representations concerning YWL or TRI; (3) the agreement contains illegal terms; and (4) Rullan breached it first and therefore cannot assert a breach-of-contract claim against Greenberg.  Each of these arguments fails.

### i.  Whether the PSA is an Unenforceable Letter of Intent

Greenberg argues that the PSA was an unenforceable letter of intent to enter into a later agreement, and focuses on the term providing for "a due diligence of the company" and the

---

[7]   Rullan argues that several of the defendants' arguments are waived for failure to plead them as affirmative defenses.  The court need not address this issue because these arguments fail in any event.  But the defendants do appear to have added these affirmative defenses in their answers to Rullan's amended complaint.  "Because a plaintiff's new complaint wipes away prior pleadings, the amended complaint opens the door for defendants to raise new and previously unmentioned affirmative defenses."  *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999).  Further, waiver is not automatic, and requires a showing of prejudice or unfair surprise.  *Peterson v. Air Line Pilots Ass'n, Int'l*, 759 F.2d 1161, 1164 (4th Cir. 1985).  Rullan has shown neither.

[8]   As a federal court sitting in diversity, the court applies Maryland's choice of law rules.  *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941).  "When determining which law controls the enforceability and effect of a contract, [Maryland courts] generally appl[y] the principle of *lex loci contractus.*  Under this principle, the law of the jurisdiction where the contract was made controls its validity and construction."  *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988).  "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs."  *Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 790 A.2d 720, 728 (Md. Ct. Spec. App. 2002).  "Generally, that last act is a party's signature."  *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).  The PSA was executed in West Virginia, and that state's law therefore governs Rullan's claim for its breach.

completion of "additional legal papers."  Rullan responds that the PSA unambiguously

demonstrates the parties' intent to be bound and, more specifically, that the term in question

plainly shows that the parties agreed that the "due diligence" and "additional legal papers" would

be completed "[a]fter th[e] agreement."

"The fundamentals of a legal 'contract' are competent parties, legal subject-matter,

valuable consideration, and mutual assent." *Wellington Power Corp. v. CNA Sur. Corp.*, 614

S.E.2d 680, 684 (W. Va. 2005) (internal quotation marks omitted).  "There can be no contract" if

"the minds of the parties are not in agreement" as to "one of these essential elements[.]" *Id.*  The

Fourth Circuit addressed the distinction between letters of intent and traditional contracts in

*Burbach Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401 (4th Cir. 2002), applying

the modern trend in contract law to a case where West Virginia controlled.  Drawing

substantially from the analysis set out in *Teachers Insurance. & Annuity Association of America

v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987), the court noted that "[w]hile bare-boned

'agreements to agree' are not binding, courts have recognized two kinds of preliminary

agreements that are binding and enforceable," called Type I and Type II.  *Burbach*, 278 F.3d at

407.  A Type I agreement "occurs when parties have reached a complete agreement (including

the agreement to be bound) on all issues perceived to require negotiation." *Id.*  Such an

agreement "is preliminary only in form—only in the sense that the parties desire a more

elaborate formalization of the agreement" that is desirable but not necessary. *Id.*  "Type I

agreements bind parties to their ultimate contractual objective in recognition that a contract was

reached, despite the anticipation of further formalities." *Id.*  In that sense, Type I agreements are

like oral agreements meant to be formalized later, and West Virginia has long recognized that

such agreements create a valid and binding contract.  *Id.* at 407-08 (citing *Brown v. Western*

*Maryland Ry. Co.*, 114 S.E. 457, 460 (W. Va. 1922).  The following factors are relevant to

determining whether a Type I agreement has been made:

> 1) whether there has been an express reservation of the right not to be
> bound in the absence of a writing, 2) whether there has been partial
> performance of the contract, 3) whether all of the terms of the alleged
> contract have been agreed upon, and 4) whether the agreement at issue is
> the type of contract that is usually committed to writing.

*Id.* at 408.

> Unlike Type I agreements, Type II agreements

> do not commit the parties to their ultimate contractual objective.  Rather,
> they commit the parties to negotiate the open issues in good faith in an
> attempt to reach the contractual objective within the agreed framework.
> Under this duty to negotiate in good faith, a party is barred from renouncing
> the deal, abandoning the negotiations, or insisting on conditions that do not
> conform to the preliminary agreement.

*Id.* at 407.[9]  The following factors are relevant to determining whether a Type II agreement has

been made: "1) the language of the agreement, 2) the existence of open terms, 3) whether there

has been partial performance, 4) the context of negotiations, and 5) the custom of such

transactions."  *Id.* at 408.

The document at issue in *Burbach* was a five-page letter expressly termed a "Letter of

Intent" that set out various terms concerning the potential sale of radio station assets.  *Id.* at 404.

The letter stated that the transaction was subject to various conditions including (1) the buyers'

due diligence review of the assets, (2) completion of disclosure schedules, (3) negotiation and

execution of a mutually agreeable asset purchase agreement, and (4) FCC approval of the

---

[9]        Though "West Virginia law is silent as to whether it recognizes" Type II agreements, the Fourth Circuit
"suspect[ed] that it would."  *Burbach*, 278 F.3d at 409.  The Supreme Court of Appeals of West Virginia has since
applied the *Burbach* framework but declined to consider whether Type II agreements are consistent with West
Virginia jurisprudence.  *Hannah v. Tate*, 2014 WL 6607489, at *3 n.3 (W. Va. Nov. 21, 2014).

transfer of the stations' licenses.  *Id.*  The district court granted the defendants' motion to

dismiss, concluding that the letter was not an enforceable purchase agreement and that it expired

when the parties failed to reach a mutually agreeable asset purchase agreement.  *Id.* at 405.  The

Fourth Circuit, however, found that the letter contained ambiguous language as to the parties'

intent to be bound.  And "[w]hen intent is not clear from the face of a document, whether parties

negotiating a contract intended to be bound by a writing or whether they did not intend to be

bound until a formal agreement was prepared and signed by them must be determined from the

facts and circumstances in each case."  *Id.* at 406.  Accordingly, resolution of the issue on a

motion to dismiss was inappropriate.  *Id.* at 409.

Turning to the PSA, it is unclear whether the *Burbach* "preliminary agreement"

framework applies to a document that is expressly titled an "agreement" and includes no

conditional language.  Nowhere do the words "letter of intent" appear in the PSA, nor does the

PSA state—or even suggest—that the parties have reserved the right not to be bound.  Rather,

the PSA provides, among other things, that Greenberg "sells" to Rullan half of the total stock of

YWL and TRI for $500,000, to be paid over a period of ten years.  Greenberg indicated his intent

to be bound by the PSA's terms by initialing and signing it.  Though it was typed by Rullan, who

is neither a lawyer nor a native speaker of English, the PSA contains no ambiguous language as

to the parties' intent to be bound by its terms, which are sufficiently definite to create binding

obligations.  The PSA therefore evidences the mutual assent necessary for an enforceable

contract.  *See Teachers*, 670 F. Supp. at 498 ("It is, of course, the aim of contract law to gratify,

not to defeat, expectations that arise out of intended contractual agreement, despite informality or

the need for further proceedings between the parties."); Syl. pt. 1, *Fraternal Order of Police,*

*Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 714 (W. Va. 1996) ("It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.").

Assuming the *Burbach* framework does apply, however, the PSA is a Type I preliminary agreement. The first Type I factor looks to whether the language of the agreement indicates an express reservation of the right not to be bound. The PSA contains no such express reservation. Nevertheless, Greenberg argues that the PSA's final provision, which provides that "[a]fter this agreement, a due diligence of the company and the additional legal papers required for the transaction will be made," (Partnership and Stock Agreement 2), constitutes such a reservation "because one would not have the need to conduct due diligence if one intended to be immediately bound to the contract." (Greenberg Reply 13, ECF No. 233.) Read in context, however, this provision simply provides that the parties committed to taking care of any legal formalities necessary to effectuate the transfer to Rullan of Greenberg's ownership stake in TWI and YWL. *See Teachers*, 670 F. Supp. at 497 ("[F]irm binding commitments . . . can bind the parties to adhere in good faith to the deal that has been agreed," "notwithstanding a need for a more detailed documentation of agreement[.]"). If Greenberg wished to condition the transaction on the results of some sort of due-diligence investigation, he could easily have insisted on the presence of such a provision in the PSA. Under West Virginia law, however, courts "will not imply a condition precedent that rational parties could have drafted explicitly into their agreement, if they had desired it." *E. Shepherdstown Developers, Inc. v. J. Russell Fritts, Inc.*, 398 S.E.2d 517, 520 (W. Va. 1990). The language of an agreement "is arguably the most

important factor in a court's analysis," *Burbach*, 278 F.3d at 408, and the PSA's language cuts in favor of the existence of a Type I agreement.[10]

The second factor looks to whether there has been partial performance of the contract. Rullan says he "performed by paying $105,000 and working as Goden's partner practically for free until fired in May, 2012." (Rullan Reply 11, ECF No. 238.) It is not so simple, however, because $55,000 of that sum was used to capitalize YWI, and Rullan concedes that the remaining $50,000 was a loan. (Rullan Decl. ¶¶ 23, 32.) As to the $55,000 used to capitalize YWI, Rullan says Goden "borrowed" the money to pay Camp expenses. (Rullan Decl. ¶ 25.) Because Greenberg had a stake in the financial health of TRI and YWL, he benefited from the use of the money in this way. Further, the PSA purports to "consider[ ]" $50,000 of the initial $55,000 sum as the first payment for TRI and YWL. (Partnership and Stock Agreement 2.) Though assessment of this factor is complicated by the cavalier manner in which the parties treated the funds of the corporations connected to the Camp, it does seem that Rullan partially performed.

---

[10] Greenberg appears to argue that parol evidence, in the form of statements he says he made to Rullan during and before the drafting of the PSA, should be admissible to show that the PSA was a letter of intent. Though parol evidence is generally admissible to show the nonexistence of a contract, "the alleged condition precedent *cannot* be inconsistent with the instrument." *State ex rel. Baker v. Morgan Cty. War Mem'l Hosp. ex rel. Morgan Cty. War Mem'l Hosp. Bd. of Directors*, 718 S.E.2d 784, 791 (W. Va. 2010). Here, the parol evidence Greenberg seeks to introduce is inconsistent with the mutual assent to be bound that is evident within the four corners of the PSA, and that evidence is therefore inadmissible.

To the extent Greenberg argues that the PSA's final provision is ambiguous and parol evidence should be admitted to clarify it, he is also mistaken. "Prior or contemporaneous parol statements may not be admitted to vary written contracts, but may be admitted to explain uncertain, incomplete or ambiguous contract terms." *Glenmark Associates, Inc. v. Americare of W. Virginia, Inc.*, 371 S.E.2d 353, 354 (W. Va. 1988). "Contract language is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken." Syl. pt. 6, *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 569 S.E.2d 796, 798 (W. Va. 2002). "[A] mere difference of interpretation between the parties will not render a provision in a contract ambiguous." *Jessee v. Aycoth*, 503 S.E.2d 528, 531 (W. Va. 1998). Rather, "[t]he question as to whether a contract is ambiguous is a question of law to be determined by the court." *Id.* Viewed in context, the PSA's final provision cannot reasonably support Greenberg's interpretation of it. The PSA is entirely devoid of conditional language, and is not ambiguous as to the parties' intent to be bound by it. The "due diligence" language appears immediately after a clause recognizing the PSA as an "agreement," and immediately before a clause providing that "the additional legal papers required for the transaction" be made, making clear that the parties did not view the agreement as contingent on the results of a due-diligence investigation.

Accordingly, this factor also supports the conclusion that the PSA was an enforceable, Type I agreement.

The third factor looks to whether all of the terms of the alleged contract have been agreed upon.  Several of the PSA's terms, including those providing for the development of a procedure by which "the partners will make decisions" and for an equal salary to be set for Goden and Rullan, do call for some degree of future agreement. But those terms are not material to the focus of the transaction—the transfer of stock from Greenberg to Rullan—and they are not so vague as to destroy the mutual assent necessary to support the agreement.  *See Ridgeway Coal Co. v. FMC Corp.*, 616 F. Supp. 404, 407 (S.D.W. Va. 1985) ("It is recognized that parties can agree to agree in the future.  To do so, however, it is necessary that the terms to be agreed upon in the future be substantially drawn from the initial agreement.").  This factor appears neutral.

The fourth and final factor looks to whether the agreement is the type of contract that is usually committed to writing.  This factor cuts in favor of finding the PSA to be a Type I agreement because the PSA was a written document, signed by the parties.

Accordingly, whether or not the *Burbach* framework applies, the court concludes that the PSA is a contract and not an unenforceable letter of intent.

### ii.   Whether the PSA is Unenforceable Because It Did Not Contain Financial Representations of YWL and TRI

Greenberg argues, without citation to authority, that the PSA's failure to "speak to warranties and representations" as to the debts and assets of YWL and TRI somehow renders it unenforceable.  Greenberg has produced no authority demonstrating that West Virginia has such a requirement, and this argument fails.

### iii.   Whether the PSA is Unenforceable Because It Contains Illegal Terms

Greenberg next argues that the PSA is unenforceable because Rullan's immigration status caused the PSA to violate both federal immigration law and federal tax law concerning S corporations.  Both arguments lack merit.

A contract may be "unenforceable on public policy grounds, such as illegality," but courts are "averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain."  *Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 790 (4th Cir. 1987) (internal quotation marks omitted).  Greenberg's immigration-status argument is based on the premise that Rullan was prohibited from working in the United States on his B-1 visa.[11]  But the PSA did not call for Rullan to work in the United States.  Indeed, the evidence makes clear that Rullan's work was in Europe, recruiting European children to attend the Camp.  And even if that were not so, Rullan obtained an E-2 visa that allowed him to work in the United States for YWI from August 16, 2011, to August 14, 2013.  (E-2 Visa, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 77, ECF No. 208-58.)  Assuming without deciding that a contract calling for a violation of federal immigration law is void on public policy grounds, the PSA did not call for such a violation.  Accordingly, this argument fails.[12]

Greenberg's second argument is that the PSA is unenforceable because an S corporation (also known as a "small business corporation") may not "have a nonresident alien as a shareholder."  26 U.S.C. § 1361(b)(1)(C).  TRI was an S corporation, (*see* 2009 TRI Tax Return, Greenberg Mot. Summ. J. Ex. G, ECF No. 189-7), and Rullan was a "nonresident alien."  But a

---

[11]      "An alien is eligible for a B-1 visa if he has a residence in a foreign country and comes to the United States temporarily for business."  *Ruston v. U.S. Dep't of State*, 29 F. Supp. 2d 518, 519 (E.D. Ark. 1998) (citing 8 U.S.C. § 1101(a)(15)(B)).  "Business" refers to activities such as conventions, conferences, or consultations, but does not include "local employment."  22 C.F.R. § 41.31(b)(1).

[12]      The court does not address whether any of Rullan's activities ran afoul of immigration law.  The fact that the PSA did not call for violations of immigration law is a sufficient basis on which to determine that the PSA is not unenforceable on public policy grounds.

nonresident alien's purchase of stock in an S corporation is not illegal.  Rather, such a purchase

merely causes the entity to lose its tax status as an S corporation.  *See* 26 U.S.C. § 1362(d)(2)(A)

(a corporation's election to be an S corporation is "terminated whenever . . . such corporation

ceases to be a small business corporation").  This argument therefore also fails.  Greenberg has

not demonstrated that the PSA is unenforceable on public policy grounds.

### iv.   Whether Rullan is Precluded From Asserting a Breach-of-Contract Claim Because He Breached First

Greenberg argues in the alternative that Rullan breached the PSA first by failing to make

payments pursuant to its terms and failing to "relegate" Greenberg of his debt obligations.  Issues

of fact preclude a grant of summary judgment on this claim at this time.

"[U]nder West Virginia law, a party who sues for damages for breach of contract must

show his own compliance with the contract or that he was prevented or relieved from compliance

by the defendant."  *Milner Hotels, Inc. v. Norfolk & W. Ry. Co.*, 822 F. Supp. 341, 345 (S.D.W.

Va. 1993) (citing *Jones v. Kessler,* 126 S.E. 344 (W. Va. 1925)).  "[T]o be barred from recovery

of damages by its own breach, the plaintiff's breach must be material."  *Id.*  "Normally, the issue

of whether a breach is a material one is a question of fact for the jury."  *Id.*  But where the facts

are not in dispute, or where the evidence presented could lead to only one reasonable conclusion,

it is a question of law for the court.  *Id.*

Greenberg says that Rullan breached the PSA by (1) failing to pay Greenberg $25,000 in

January 2012 and again failing to pay him $25,000 in July 2012; (2) failing to "relegate"

Greenberg from his debt obligations and assume his personal guarantees of TRI's and YWL's

debts; and (3) failing to arrange for the "due diligence" or additional legal documents

contemplated by the PSA's final term.

Rullan responds that (1) his August 2011 $50,000 "loan" to YWL was understood by the parties to constitute a payment to Greenberg pursuant to the PSA; (2) Greenberg's debts were forgiven by Goden and Greenberg at the time the PSA was executed; and (3) it was Greenberg who refused to comply with the PSA's final term by not tendering his stock certificates.  Rullan further argues that it was Greenberg who first breached the agreement by, among other things, repudiating the sale of his stock to Rullan and attempting to convert into unsecured debt the money Rullan supposedly paid for the stock.

The voluminous exhibits submitted by the parties contain evidence sufficient for a jury to find that either Rullan or Greenberg first breached the PSA.  Accordingly, Greenberg's motion for summary judgment as to Rullan's claim for breach of the PSA will be denied.[13]

## B.  Fraudulent Inducement

Greenberg also has moved for summary judgment on Rullan's claim of fraudulent inducement, arguing that Greenberg made no misrepresentation or material omission.[14]  In determining what body of law to apply in a tort case, Maryland follows the rule of *lex loci delicti*, under which a court applies the law of the state where the last event constituting the tort occurred.  *Erie Ins. Exch. v. Heffernan*, 925 A.2d 636, 648-49 (Md. 2007).  Because the actions constituting the alleged torts in this case occurred in West Virginia, that state provides the substantive law for these claims.

"Generally speaking, '[f]raud has been defined as including all acts, omissions, and

---

[13]     In his reply, Greenberg argues in the alternative that the PSA concerned the sale of stock and therefore could not have created a partnership.  None of the parties suggest that Greenberg was Rullan's partner, however, and it is unclear how Greenberg believes this argument affects his motion for summary judgment.  (The court will address Goden's similar argument below.)

[14]     Despite Rullan's statement otherwise, (Pl.'s Opp'n Greenberg Mot. Summ. J. 36), the only fraud claim remaining against Greenberg is fraudulent inducement as to the PSA.

concealments which involve a breach of legal duty, trust or confidence justly reposed, and which are injurious to another, or by which undue and unconscientious advantage is taken of another.'" *Kessel v. Leavitt*, 511 S.E.2d 720, 752 (W. Va. 1998) (citation omitted).  "The essential elements in an action for fraud are: '(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; [3] that plaintiff relied upon it and was justified under the circumstances in relying upon it; and [4] that he was damaged because he relied upon it.'"  Syl. pt. 1, *Lengyel v. Lint*, 280 S.E.2d 66, 67 (W. Va. 1981) (citation omitted). "The critical element of a fraudulent inducement claim is an oral promise that is used as an improper enticement to the consummation of another agreement."  *Traders Bank v. Dils*, 704 S.E.2d 691, 696 (W. Va. 2010).

Greenberg argues that (1) Rullan failed to produce evidence of an act or omission by Greenberg sufficient to sustain a fraud claim; (2) Rullan failed to produce evidence of justifiable reliance on any allegedly material, false statement; (3) Rullan is estopped from claiming fraud because he acquiesced to the transaction with knowledge of the Camp's true financial situation; (4) Rullan failed to produce evidence of damages; and (4) Greenberg had no duty to disclose information to Rullan.

Rullan responds that (1) Greenberg had a duty to disclose material information to Rullan; (2) Greenberg owed Rullan a duty of candor; (3) Greenberg failed to disclose material information to Rullan; (4) Greenberg fraudulently represented to Rullan that he was Goden's partner; (5) Greenberg may be held liable for Goden's misrepresentations; (6) Rullan justifiably relied on the misrepresentations; and (7) Rullan suffered damages as a result.

To begin, Rullan cites no West Virginia authority establishing that an omission may give

rise to a claim for fraudulent inducement.  It is true that "an action for fraud can arise by the concealment of truth," and that fraud "is the concealment of the truth just as much as it is the utterance of a falsehood."  *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640, 654 (W. Va. 2012) (citations and internal quotation marks omitted).  But in an action for fraudulent inducement to contract, there must exist "an oral promise that is used as an improper enticement to the consummation of another agreement."  *Traders Bank*, 704 S.E.2d at 696.  An omission is not an oral promise, and it is therefore unclear whether an omission can sustain a fraudulent-inducement claim.

Rullan is correct, however, that West Virginia law allows for a knowing beneficiary of fraud to share liability for the fraudulent conduct of another.  *Wood Cty. Bank v. King*, 89 S.E.2d 627, 630 (W. Va. 1955).  Material misrepresentations made by Goden of which Greenberg had knowledge (whether because he was present when she made them or for some other reason) may therefore be attributable to Greenberg.[15]

Rullan alleges that Goden made a number of material misrepresentations on which he relied when he decided to agree to the PSA, and says he worked for the Camp for very little pay based in part on those representations.  Goden, however, has yet to be deposed, and summary judgment would therefore be premature on this claim.  Accordingly, Greenberg's motion for summary judgment as to Rullan's claim of fraudulent inducement will be denied.

### C.  Unjust Enrichment

Greenberg also seeks summary judgment on Rullan's unjust-enrichment claim against him.  Maryland's choice-of-law rule applicable to unjust-enrichment claims is not entirely clear.

---

[15]     Rullan also argues that Goden acted as Greenberg's agent in making the statements at issue.  The court need not, and therefore does not, address this argument.

*See RaceRedi Motorsports, LLC v. Dart Mach., Ltd.*, 640 F. Supp. 2d 660, 665-66 (D. Md. 2009)

(describing alternative choice-of-law approaches to unjust-enrichment claims and ultimately

applying the rule of *lex loci contractus*).  Rullan argues, and Greenberg does not dispute, that the

law of unjust enrichment is substantially similar in Maryland, West Virginia, and Florida.  *See*

*Cty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607 n.7 (Md.

2000) (unjust enrichment under Maryland law entails "1. A benefit conferred upon the defendant

by the plaintiff; 2. An appreciation or knowledge by the defendant of the benefit; and 3. The

acceptance or retention by the defendant of the benefit under such circumstances as to make it

inequitable for the defendant to retain the benefit without the payment of its value"); *Realmark*

*Developments, Inc. v. Ranson*, 542 S.E.2d 880, 884-85 (W. Va. 2000) (unjust enrichment under

West Virginia law exists "if benefits have been received and retained under such circumstance

that it would be inequitable and unconscionable to permit the party receiving them to avoid

payment therefor"); *Morris v. ADT Sec. Servs.*, 580 F. Supp. 2d 1305, 1312 (S.D. Fla. 2008)

("Under Florida law, to prevail on a claim for unjust enrichment, a plaintiff must prove that (1)

'the plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) the

defendant has voluntarily accepted and retained the benefit conferred; and (3) the circumstances

are such that it would be inequitable for the defendant to retain the benefit without paying the

value thereof to the plaintiff.'" (citation omitted)).

The court need not determine at this time which state's law applies, because under any of

these standards Rullan has produced sufficient evidence for a jury to find that Greenberg was

unjustly enriched through Rullan's cash infusions to the Camp (which Greenberg contends he

still owns) and by accepting Rullan's labor for little payment in return.  Accordingly,

Greenberg's motion for summary judgment on this claim will be denied.

### D.  Shareholder Oppression

Greenberg says he is entitled to summary judgment on Rullan's claims of shareholder oppression because Rullan was never a shareholder in TRI or YWL.[16]  Rullan disagrees, and points to the two documents with Goden's signature that purportedly certify his purchase of stock in TRI and YWL.  (*See* Greenberg Mot. Summ. J. Ex. YY.)

Rullan's claim of shareholder oppression as to TRI arises under West Virginia law.  West Virginia recognizes an "oppressive conduct exception to the general rule that a corporation has complete control of its affairs."  *State ex rel. Smith v. Evans*, 547 S.E.2d 278, 283 (W. Va. 2001).  This cause of action stems from West Virginia Code § 31D-14-1430(2)(B), which authorizes a circuit court to dissolve a corporation in a proceeding by a shareholder if it is established that the "directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent."  Courts may apply a number of alternatives to dissolution, however, including an award of damages.  *State ex rel. Smith*, 547 S.E.2d at 283-84.

Oppressive conduct is tied to a violation of fiduciary duty.  "While the officers and directors of a business corporation are accorded a rather broad latitude in the conduct of the affairs of the corporation, they occupy a fiduciary relationship toward it and its shareholders.  The same fiduciary relationship exists on the part of the majority shareholders of a business corporation toward its minority shareholders."  Syl. pt. 2, *Masinter v. WEBCO Co.*, 262 S.E.2d 433, 435 (W. Va. 1980).  "A violation of the fiduciary relationship may result from oppressive conduct, which is conduct that departs from the standards of good faith and fair dealing which

---

[16]     Rullan's does not argue that Greenberg may be held liable for shareholder oppression as to YWI, as Greenberg was not a shareholder of YWI.

are inherent in the concept of a fiduciary relationship." *Id.* at syl. pt. 3. "An attempt to 'freeze or squeeze out' a minority shareholder from deriving any benefit from his investment in a private business corporation, without any legitimate business purpose, may constitute oppressive conduct." *Id.* at syl. pt. 4.

Rullan's claim of shareholder oppression as to YWL arises under Maryland law. Maryland, like West Virginia, recognizes a cause of action for shareholder oppression. *Edenbaum v. Schwarcz-Osztreicherne*, 885 A.2d 365, 377-79 (Md. 2005). This cause of action stems from a statute authorizing a stockholder to petition a court to dissolve a corporation on the grounds that the "acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent." Md. Code Ann., Corps. & Ass'ns § 3-413(b)(2). Oppressive conduct includes "'conduct that substantially defeats the "reasonable expectations" held by minority shareholders in committing their capital to the particular enterprise.'" *Edenbaum*, 885 A.2d at 378 (citation omitted). Conduct is not oppressive, however, unless these defeated reasonable expectations were both reasonable under the circumstances and central to the aggrieved party's decision to join the venture. *Id.* at 379.

Greenberg argues that Rullan was never a shareholder of TRI or YWL, as no stock certificates were issued to Rullan and no "formal stock purchase agreements" concerning those entities were executed. (Greenberg Mot. Summ. J. 49.) Greenberg points to no authority suggesting that a contract term providing for the payment of a set sum of money for a set quantity of stock, as existed in the PSA, is insufficient to constitute a valid stock transfer.[17] And though the parties dispute the evidentiary value of the documents Goden signed that purportedly

---

[17]     Further, Alex Reece, YWL's witness under Federal Rule of Civil Procedure 30(b)(6), testified that no stock certificates were ever issued for YWL. (Reece Dep. 36, Pl.'s Opp'n Greenberg Mot. Summ. J. Ex. 16, ECF No. 206-16.)

certify Rullan's purchase of 10% of YWI and TRI, the court may not assess the weight of that

evidence on summary judgment.  Accordingly, Greenberg's motion for summary judgment on

this claim will be denied.

### III. Goden's Motion for Partial Summary Judgment

Goden indicates that she seeks summary judgment "with respect to all" of Rullan's

claims against her.  She provides no argument, however, as to Rullan's claims of conversion

(which this court previously dismissed as to Greenberg).  Accordingly, the court will not address

Rullan's conversion claim.

### A.  Breach of Contract

First, Goden seeks summary judgment on Rullan's breach-of-contract claim based on the

PSA, raising the same arguments Greenberg raised.  The court has already considered and

rejected these arguments, and will therefore deny Goden summary judgment on this claim.

Goden also argues in the alternative that the PSA did not constitute a partnership

agreement because it concerned the sale of stock.  A partnership is "an association of two or

more persons to carry on as coowners a business for profit . . . ."  W. Va. Code Ann. § 47B-1-

1(7); *see also* W. Va. Code Ann. § 47B-2-2(a) ("[T]he association of two or more persons to

carry on as coowners a business for profit forms a partnership[.]").  Goden certainly represented

to Rullan and others that she was Rullan's partner.  (*See, e.g.*, Goden Mot. Summ. J. Ex. JJJ,

ECF No. 232-25, 232-25; Partner Emails.)  She even used Rullan's supposed status as a partner

to suggest that he was required to invest more money in the Camp.  (*See* Pl.'s Ex. 27 at 5 ("Do I

have a partner who is willing and able to help me with the problems of running a business? . . .

If I put 10000 into the business then so must you.").)  Despite this, Goden suggests that her and

Rullan's "use of the term 'partner' should be viewed as an informal term of their relationship, not a legal binding terms between them." (Goden Reply 28 n.25, ECF No. 232.) But Goden cites no authority suggesting that partners may not also share ownership of corporations involved in their business venture. Accordingly, this argument fails.

Second, Goden seeks summary judgment on Rullan's breach-of-contract claim based on the oral employment agreement allegedly reached in Florida in early December 2010. The court previously dismissed this claim as to Greenberg because it was barred by the statute of frauds, as the agreement could not be performed within one year of its making. *See* Fla. Stat. Ann. § 725.01 ("[A]ny agreement that is not to be performed within the space of 1 year from the making thereof . . . shall be in writing and signed by the party to be charged therewith . . . ."). This was so because the alleged oral agreement was reached in early December 2010, but the year-long employment agreement that was its focus was not to begin until January 2011.

Rullan now raises a new argument, suggesting that Florida's statute of frauds did not render the oral employment agreement unenforceable because that agreement was actually fully performed. *See Rubenstein v. Primedica Healthcare, Inc.*, 755 So. 2d 746, 748 (Fla. Dist. Ct. App. 2000) ("The statute of frauds only applies to executory contracts, not to agreements that have been fully performed."). Rullan says the oral agreement terminated on August 24, 2011, when the parties entered into the PSA, but that the parties had fully performed because the agreement authorized the parties to make Rullan a partner at any time during the first year of employment.

This argument ignores both Rullan's allegations in his amended complaint, which refer explicitly to "an oral agreement that was to last one year," (Am. Compl. ¶ 40), and Rullan's own

minutes of the meeting that gave rise to the oral agreement, which repeatedly refer to an

employment term of one year that would begin in January 2011, (Pl.'s Opp'n Mot. Summ. J. Ex.

49, ECF No. 207-49).  The agreement was not fully performed, as Rullan concedes that the

parties terminated it before the one-year term was completed.  Accordingly, Rullan's claim for

breach of this agreement remains barred by Florida's statute of frauds, and summary judgment

will be granted to Goden on this claim.

### B.  Fraud and Fraudulent Inducement

This case was previously stayed as to Goden, and she has not yet been deposed.  Rullan's

counsel has filed an affidavit pursuant to Federal Rule of Civil Procedure 56(d) pointing to

relevant information that Goden's deposition could provide.  The court will not grant summary

judgment to Goden on her fraud claim at this time.

### C.  Unjust Enrichment

Rullan has produced sufficient evidence for a jury to find that Goden was unjustly

enriched through Rullan's cash infusions to the Camp and by accepting Rullan's labor for little

payment in return.  Accordingly, Goden's motion for summary judgment on this claim will be

denied.

### D.  Shareholder Oppression

Goden also seeks summary judgment on Rullan's claims of shareholder oppression as to

TRI and YWL for the same reasons the court has already rejected, and the court will deny Goden

summary judgment as to those entities.

As to YWI,[18] of which Goden and Rullan were the only shareholders, Goden argues she

---

[18]     YWI is a Maryland corporation, (*see* YWI Corporate Documents, Pl.'s Mot. Summ. J. Ex. 59, ECF No. 207-59), and Rullan's shareholder-oppression claim as to that entity therefore arises under Maryland law.

is entitled to summary judgment because Rullan "admits that YWI was formed for fraudulent

purposes, conducted no real business activities, and had no assets." (Goden Mot. Summ. J. 50,

ECF No. 190.)  It is true that Rullan testified during his deposition that Goden and Gershberg

agreed YWI's creation was necessary for Rullan to obtain a visa.  (Rullan Dep. 335-36.)  But that

is far from an admission that YWI conducted no real business activities and had no assets.

Indeed, YWI's bank statements show substantial activity.  (*See* YWI Bank Statements, Pl.'s

Opp'n Mot. Summ. J. Ex. 3, ECF No. 207-3.)  Accordingly, summary judgment will also be

denied as to Rullan's shareholder oppression claim as to YWI.

### E.  Negligence, Breach of Fiduciary Duty, and Accounting

Goden briefly (and without citation to authority) argues that she is also entitled to

summary judgment on Rullan's claims of negligence, breach of fiduciary duty, and for an

accounting, because Rullan has "unclean hands with respect to YWI."  (Goden Mot. Summ. J.

50.)  The court cannot say at this time that, as a matter of law, that Rullan has "unclean hands" or

that this bars his claims for negligence, breach of fiduciary duty, and for an accounting of the

entities at issue in this case.  Accordingly, Goden's motion for summary judgment on these

claims will be denied.

### IV. Rullan's Cross-Motions for Partial Summary Judgment

Rullan has cross-moved for summary judgment on several of his claims.  None of his

arguments succeed.  The court has already determined that issues of fact preclude a grant of

summary judgment at this time on Rullan's claim that Greenberg breached the PSA, and will

therefore deny Rullan's cross-motion for summary judgment on this claim.  The same goes for

Rullan's claim as to Goden.

The court has granted summary judgment to Goden on Rullan's claim based on the alleged breach of an oral employment agreement, and will therefore also deny Rullan's cross-motion for summary judgment as to that claim.

## CONCLUSION

For the reasons stated above, Greenberg's motion will be denied; Goden's motion will be granted in part and denied in part; and Rullan's motions will be denied.

A separate order follows.


September 23, 2015                                        _____/S/_____
Date                                                     Catherine C. Blake
                                                         United States District Judge

36