## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LUIS RULLAN                          :
                                     :
                                     :
    v.                               :        Civil No. CCB-12-2412
                                     :
                                     :
JILL GODEN, *et al.*                 :
                                     :

## MEMORANDUM

    This case involves a West Virginia summer camp; the companies that own and manage the camp, Timber Ridge, Inc. ("TRI") and Youth World, Ltd. ("YWL"); and the failed business relationship between plaintiff Luis Rullan, a Spanish national, and defendants Jill Goden and her father, Fred Greenberg. Now pending before the court are TRI's motion to dismiss for lack of personal jurisdiction, TRI and YWL's motion to dismiss for insufficient service of process and failure to state a claim, and Greenberg and Goden's motion for a show cause order. The issues have been fully briefed, and no hearing is necessary. *See* Local R. 105.6 (D. Md. 2014). For the reasons stated below, TRI's motion to dismiss for lack of personal jurisdiction will be denied; TRI and YWL's motion to dismiss, construed as a motion for summary judgment, will be granted in part and denied in part; and Greenberg and Goden's motion for a show cause order will be denied. Much of the factual background and legal analysis in this memorandum was already set forth in the opinion issued September 23, 2015 resolving earlier motions for partial summary judgment. It is repeated here for ease of reference.

## BACKGROUND

    In 1955, Greenberg established the Timber Ridge Camp (the "Camp") in High View,

West Virginia, as an overnight summer camp for children. (Greenberg Decl. ¶ 1, Defs.' Reply Ex. 19, ECF No. 249-19.) Prior to Rullan's involvement with the Camp, Goden and Greenberg each owned 50% of the companies that own and manage the Camp: TRI and YWL. (*See* Greenberg Decl. ¶¶ 2-3.) As of August 2014, YWL no longer operates the Camp and has filed a complaint in Maryland seeking judicial dissolution. (Greenberg Decl. ¶ 3.)[1]

Around 2010, Greenberg decided to "get out of the Camp business" and thought about "adding a European partner" because "Goden could not manage the Camp alone and needed help." (Greenberg Decl. ¶¶ 5-7.) He wanted a partner who would increase the number of international campers and "who was relatively wealthy who could capitalize the business." (Greenberg Decl. ¶ 7.) In late 2010, Greenberg contacted Rullan, who Greenberg believed came from a wealthy family. (Greenberg Decl. ¶¶ 7, 9, 11.) Rullan began attending the Camp in 1990 when he was 6 years old, and he and his four siblings attended the Camp as campers and counselors for about 20 years. (Greenberg Decl. ¶ 8.) Greenberg and Goden "became very close friends with Rullan and his family." (Greenberg Decl. ¶ 9.)

On December 7, 2010, Rullan and his father met with Goden and Greenberg at the St. Andrews Country Club in Florida, where they discussed Rullan's possible involvement with the Camp. (Greenberg Decl. ¶¶ 12-13; Rullan Decl. ¶ 5, Pl.'s Opp'n Ex. 10, ECF No. 229-9.) Rullan presented a PowerPoint to Goden and Greenberg that included his understanding of the Camp's liabilities, based in part on information Goden and Greenberg previously provided him, but that information did not accurately portray the extent of the Camp's debt, liabilities, and size. (Rullan

---

[1] The Camp is now operated by Cacapon River Camps, which is owned by Eric Goden, the husband of Jill Goden, and Alex Reece, the Camp's former office manager. (Greenberg Dep. 253-54, Pl.'s Opp'n Ex. 16, ECF No. 229-15.) Cacapon River Camps is based out of Goden's home in Maryland. (*Id*. at 255.)

Decl. ¶ 5; St. Andrews Presentation, Mot. Dismiss Ex. H, ECF No. 204-10.) Neither Goden nor

Greenberg corrected Rullan's misunderstanding. (Rullan Decl. ¶ 7; Greenberg Decl. ¶ 13.)

The parties disagree about what was said at the meeting. Rullan claims that Goden and

Greenberg entered into an oral employment agreement with him in which they would pay him

$72,000 annually to recruit European campers. (Rullan Decl. ¶¶ 8-11.) Part of the agreement,

Rullan alleges, was that if he and Goden "worked well together during the first year, Greenberg

would sell his half of the Camp and Goden would make [Rullan] her partner." (*Id*. at ¶ 8.) He

also claims that Greenberg authorized Goden to make Rullan her full partner at any time during

his first year. (*Id*.)

Greenberg maintains that he and Goden told Rullan he would need to work successfully

with Goden for at least a year and recruit European campers before it could be determined

whether Rullan could buy Greenberg's interest in TRI and YWL. (Greenberg Decl. ¶¶ 15-16,

18.) After the meeting, Rullan drafted a document titled "Minutes meeting December 7, 2010 –

St Andrews" and emailed it to Goden. (Rullan Decl. ¶ 12.) The document states that Rullan will

work as an employee for one year, beginning in January 2011. (St. Andrews Minutes, Defs.'

Reply Ex. L at 2, ECF No. 249-3.) Further, "[a]fter year one there will be a meeting to evaluate

the year and see the results obtained as well as setting the partnership agreement that better suits

everyone's needs. If everything goes well the idea is to obtain shares of the company," and

Rullan would "have to invest [i]n the company, the basis [to be] set after year one." (*Id*. at 2-3.)

Rullan began working for the Camp soon after the meeting in Florida, and Goden referred to

Rullan as her "partner" just days after the meeting. (Rullan Decl. ¶ 10; Goden December 13,

2010 Email, Defs.' Reply Ex. M, ECF No. 249-4.)

In January 2011, Rullan and Goden formed a company called Youth World International, Ltd. ("YWI"). (Goden Decl. ¶ 41, Defs.' Reply, ECF No. 249-20.) The purpose of the company was to recruit campers from Europe, and Rullan and Goden each owned half of the business. (*Id*.)

On January 29, 2011, Greenberg executed a promissory note in which Greenberg and TRI borrowed $350,000 from Lawrence Phillips. (Rullan Decl. ¶ 17.) Rullan claims that neither Goden nor Greenberg disclosed the loan to him. (*Id*.) Greenberg says, however, that he actually borrowed the money in 2009, and the promissory note merely documented this prior loan. (Greenberg Decl. ¶ 30.) Rullan states that he would not have continued to pursue the business venture had he known of this liability, unrelated lawsuits against the defendants and the Camp, the Camp's cash flow issues, the actual acreage of the Camp, the extent of the defendants' commingling of funds, or that Goden "apparently had no intention of allowing [Rullan] to co-manage the Camp or to act as her full partner. . . ." (Rullan Decl. ¶¶ 14, 17.)

Rullan alleges that he and Goden agreed to become full partners in February 2011 when they went on a recruiting trip together in Europe. (Rullan Decl. ¶ 18.) Goden denies talking about a partnership during this time and claims that she and Rullan only discussed recruiting campers and YWI. (Goden Decl. ¶ 42.)

After the recruiting trip, Rullan and Goden met with Richard Gershberg to help Rullan get an E-2 visa to work in the United States.[2] (Goden Decl. ¶ 46; Rullan Decl. ¶¶ 21-22.) Gershberg advised Goden and Rullan to contribute $55,000 each to YWI. (Rullan Decl. ¶ 23.)

---

[2] An E-2 visa allows a non-citizen to enter the United States "solely to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital." 8 U.S.C. § 1101(a)(15)(E)(2).

4

Rullan invested $55,000 in YWI, but Goden contributed nothing. (*Id*.) Goden and Rullan each received half of YWI's total shares. (Rullan Decl. ¶ 24.) Within a few days, Goden transferred the $55,000 to YWL's bank account, telling Rullan she had to borrow the money to pay Camp bills and she would repay the YWI account. (Rullan Decl. ¶ 25.) Goden never repaid the money to YWI. (*Id*.) Instead, she and Greenberg later "agreed in writing that the $55,000 would be credited toward [Rullan's] purchase of Greenberg's stake in the Camp." (*Id*.)

Rullan worked at the camp during the summer of 2011. (Greenberg Decl. ¶ 37.) Greenberg claims that "Rullan did not demonstrate . . . that he was ready or capable to run and manage the day to day activities of the Camp." (*Id*.) Specifically, Greenberg says that Rullan "gave preferential treatment to the European campers over the American campers," "came off as pompous," and did not do the "menial labor" that is required to run a summer camp. (*Id*. at ¶¶ 37-38.) During that summer, Rullan learned that two separate companies, YWL and TRI, owned and managed the Camp, and Camp bills were sometimes paid late. (Rullan Decl. ¶ 29.)

On June 4, 2011, Rullan met with Goden and Greenberg at Goden's house at the Camp to "discuss committing [his] partnership agreement with Goden into writing and to identify any outstanding issues about [their] partnership." (*Id*. ¶ 30.) During the meeting, Goden and Greenberg "continued to refer to [Rullan] as Goden's full partner in the Camp." (*Id*.) Rullan claims that Goden said the Camp had enough money to pay each of them an annual salary of between $72,000 and $100,000, and neither Greenberg nor Goden disclosed to him the extent of the Camp's liabilities. (*Id*. ¶¶ 30-31.)

On August 8, 2011, Rullan says Goden asked him to lend $50,000 to the Camp to cover a cash flow shortage. (*Id*. ¶ 32.) Rullan claims Goden told him that as her full partner and co-

owner of the Camp, he had co-equal financial responsibility for the Camp. (*Id*.) In reliance on this statement, he wired $50,000, the remainder of his life savings, to YWL the next day. (*Id*. at ¶¶ 32-33.)

Rullan alleges that on August 15 and 18, 2011, he met with Goden and Greenberg "to discuss various issues regarding the partnership, including . . . assuming Greenberg's equity stake in the Camp (TRI and YWL)." (*Id*. ¶ 35.) Rullan says that during these meetings, Goden and Greenberg continued to refer to him as Goden's partner. (*Id*.) On August 24, 2011, Rullan says that he, together with Greeberg and Goden, drafted a document at the Camp titled "Partnership agreement August 24th, 2011 – Timber Ridge Camp, HV, WVA." (*Id*. ¶ 36; Partnership and Stock Agreement ("PSA"), Mot. Dismiss Ex. C, ECF No. 204-5.)

Greenberg's account differs. He claims that in August 2011, "Rullan became increasingly concerned [Greenberg] would never sell Rullan [his] interest in the Camp." (Greenberg Decl. ¶ 39.) Greenberg alleges that Rullan's concerns were based on his "failure to recruit enough European campers and his poor performance at Camp that summer." (*Id*.) According to Greenberg, "Rullan was adamant about having a letter of intent that he would have the opportunity to purchase [Greenberg's] interest in the Camp the next spring." (*Id*. ¶ 40.) Greenberg claims he told Rullan that "formalizing an agreement would take years," "attorneys would need to handle any contract," and Gooden and Greenberg "still needed to evaluate the companies and [Rullan's] involvement." (*Id*.) Nevertheless, Greenberg says, on August 18, 2011, Rullan presented Goden and Greenberg with a set of proposed terms to a deal to purchase Greenberg's interest in the Camp. (*Id.* ¶ 41.) Greenberg claims he "did not want to sign" the document because "Rullan had not even completed the one year vetting period, nor had he

6

demonstrated that he was capable of managing the Camp and working with Goden, nor did

[Greenberg] know if he could even afford to support the Camp and to pay off any of the debts

that [Greenberg] had amassed on behalf of TRI and YWL to support the Camp." (*Id.* ¶ 42.)

Greenberg says that Rullan assured him that the terms were "only a letter of intent" meant to

"document the general terms of a possible agreement" to be agreed upon in the future if Goden

and Greenberg "agreed to have Rullan proceed with purchasing [Greenberg's] interest in the

Camp." (*Id.*)

There is no dispute that on August 24, 2011, Greenberg, Goden, and Rullan signed the

PSA, which states that "Fred Greenberg, Jill Goden and Luis Rullan, agree to the following:"[3]

- Fred Greenberg as the founder of Timber Ridge he will always have the recognition from Luis Rullan.  His thoughts and ideas to improve the business will be always taking into consideration and will always be welcome.
- At this point Fred Greenberg, owns 50% of the stock in the company "Youth World LTD T/A Timber Ridge Camps" and Jill Goden owns the remaining 50%.  Jill Goden also owns 50% of Timber Ridge Inc. and Fred Greenberg owns the remaining 50% of Timber Ridge Inc.
- Fred Greenberg sells to Luis Rullan 50% of the total stock of both companies, 50% of Youth World LTD and 50% of Timber ridge Inc.  That will be paid as per 50,000 USD per year during a 10 year period (starting 2011) for a total amount of 500,000 USD.
- If Fred dies before the obligation is finished, the obligation remains to whom he decides.
- There is the intention of pay 2 times per year during the total period of the agreement (10years starting 2011).  One in January and the second one in July.
- We agreed that we will set an equal salary between Jill Goden and Luis Rullan.
- Jill Goden and Luis Rullan will relegate Fred Greenberg from his debt obligations related to the company (Youth World LTD.)
- As soon as the market conditions allow it, without an extra cost for the company, Jill Goden and Luis Rullan will assume Fred Greenberg's personal guaranties in the company.

---

[3] Rullan is not a native English speaker, and the PSA contains typographical and grammatical errors. The court reproduces the document as it was drafted.

- Both partners will have the first right of refusal in the case that a partner has the intention to sell any of their stock.
- When the stock is to be transferred to a family member (only son or daughter of a partner) of any of the stockholders it is only allowed to transfer 49% of the stock.  The remaining 1% will be transferred to the other stockholder.
- Decisions will be made by mutual agreement between Jill Goden and Luis Rullan.
- In the future we will develop a procedure to set the way that the partners will make decisions.
- Any investment or expense for the company for over $ 5,000 has to have Jill Goden and Luis Rullan approval.
- In the case of missing a payment without an agreed solution from the partners, Luis Rullan will not have the right to the remaining percentage of the stock in the company.  In case of a default, Luis Rullan will not have the right to the stock in the company, he will only have the right to what the company owes him up to that point.
- Up to date, 50,000 USD out of the 55,000 USD that Luis Rullan deposit in Youth World International LTD are considered as the payment of the first 5% of the total stock of Youth World LTD and the 5% of the total stock of Timber Ridge Inc. bought to Fred Greenberg.
- In case of a profit, before returning money to the partners, 50% will go to reduce the debt, 25% for capital improvement and the remaining 25% will be decided by Jill Goden and Luis Rullan.
- If the company shows a profit or if it is able to pay, Youth World LTD, will transfer Fred Greenberg until 2020 (included), a fixed quantity of $ 19,000 the first month of the year in order for him to pay his car ($ 8,000), phone ($ 4,200) and medical insurance ($ 8,800) bills for the whole year.  No other compensation will be given to him besides the one above mentioned ($ 19,000).  If he exceeds the quantity agreed he will take care of the remaining amount personally.  Anything related to this matter he will have to discuss with Luis Rullan.
- We will come up with a solution that we agreed with the accountant and lawyer to see if its better to pay Fred's expenses out of the first $25,000 USD paid the first month of the year.
- After this agreement, a due diligence of the company and the additional legal papers required for the transaction will be made.

(PSA.)

If Rullan had known the Camp's true financial situation, he says he would not have

signed the PSA, would not have continued to work as Goden's partner without an annual salary

of at least $72,000, and would have demanded the return of the $105,000 he had invested in the companies. (Rullan Decl. ¶¶ 39-40.)  Rullan claims that Greenberg and Goden "agreed to provide [Rullan] with detailed financial information about YWL, TRI, the Camp, and Greenberg's finances," and Goden "agreed she would hire an attorney to execute additional legal documents, such as transferring and registering stock certificates, " but they never did. (*Id.* ¶ 41.)

Rullan asked Goden for YWL and TRI stock certificates to document his investments in the companies. (*Id*. ¶ 47.) Goden told him she did not have stock certificates and she could not afford to pay a lawyer, and Rullan asked for alternative documentation. (*Id*.) Goden says that Rullan sent her an email on October 27, 2011, asking her "to sign two letters that he attached to the email evidencing that Rullan had paid [Greenberg] for a total of 10% of the Camp (YWL and TRI) to help him with his 'legal problems.'" (Goden Decl. ¶ 93; Rullan October 27, 2011 Email, Mot. Dismiss Ex. B, ECF No. 204-4.) In his email, Rullan wrote that he "just spoke to [his] 'Tax Advisor'" who recommended that Rullan have some record that his $105,000 in wire transfers to the United States were used to purchase stock in TRI and YWL. (Rullan October 27, 2011 Email.) On October 27, 2011, Goden faxed Rullan a signed document from the Camp's Maryland office stating that Rullan had paid $55,000 to YWI, and $50,000 of that money would purchase 5% of stock in both YWL and TRI. (Stock Transfer Certification, Pl.'s Opp'n Ex. 17, ECF No. 229-16; Fax Number Documentation, Pl.'s Opp'n Ex. 18, ECF No. 229-17.) On October 31, 2011, Goden faxed Rullan another signed document, which provided that Rullan had paid an addition $50,000 to YWL for another 5% of both TRI and YWL, and that as of October

27, 2011, Rullan had paid $100,000 for 10% of the stock of both companies. (Stock Transfer Certification.)[4]

By late 2011, Rullan's relationship with Goden and Greenberg was deteriorating. On December 2, 2011, Goden sent an email to Rullan. She wrote, "You gave the business 105,000.00 towards the purchase of this camp. In May this contract either needs to be signed with an agreement we can both live with or you may want your money back and walk away." (Goden December 2, 2011 Email, Mot. Dismiss Ex. E, ECF No. 204-7.) Rullan alleges that Goden "made it increasingly difficult" to work as a partner and shareholder by preventing him from implementing a business plan, accessing YWL's and TRI's financial records, supervising Camp employees, and limiting expenses. (Rullan Decl. ¶ 53.) On a January 2012 trip to the Camp's Maryland office, Rullan was "surprised" to learn that the Camp's 2010 appraised value was $2.9 million because Goden had previously told him the Camp was worth $6 million. (*Id*. ¶¶ 42, 54.) At that time, Rullan claims that Goden told him about a $2.4 million loan, making Greenberg's share of the equity in the Camp only worth $250,000, but Rullan had agreed to purchase it for twice that amount. (*Id*.) Rullan also learned that Goden and Greenberg used Camp funds to pay for their personal expenses and comingled Camp funds with their own personal accounts. (*Id*. ¶¶ 55–56.)

Throughout late 2011 and early 2012, Rullan says that Goden asked him for "more money as the Camp experienced more cash shortfalls." (*Id*. ¶ 62.) Rullan thinks that "Goden expected [the Rullan family] to bail out YWL, TRI, and the Camp," and when it became clear

---

[4] The defendants suggest that the emails Rullan sent Goden and his Spanish acquaintances establish fraudulent intent on Rullan's part. The court is not persuaded. In his email to Goden, Rullan clearly describes the documents as "investment proof." (Rullan October 27, 2011 Email.) Contrary to the defendants' allegations, there is no mention of any Spanish government investigation in the email. (*Id*.) Furthermore, Rullan sent the emails to his Spanish acquaintances after Goden signed and returned the documents to him. (Translation of Spanish Emails, Defs.' Reply Ex. O, ECF No. 249-6.)

that Rullan "had already exhausted his life savings and that [his] family would not be helping,
Goden became increasingly agitated" and demanded that Rullan contribute more money or bring
in more campers. (*Id*.) After Greenberg's wife died in March 2012, Rullan says that Greenberg
wanted to become involved in TRI and YWL again because he now had access to all of their
wealth. (Rullan Decl. ¶¶ 65-66.) Greenberg claims that "Rullan's ineptitude caused the Camp to
lose thousands of dollars and [Greenberg] was forced to infuse the [C]amp with an additional
$70,000 of [his] personal money" in 2012. (Greenberg Decl. ¶ 74.)

On May 8, 2012, Greenberg sent Rullan an email expressing disappointment in Rullan's
recruiting of European campers. (Greenberg Emails PL 03374-76, Defs.' Reply Ex. N, ECF No.
249-5.) He wrote that he and Goden "felt that the financial status of the Rullan family would
have been sufficient to allow them to assume their share of the debt service." (*Id.* at PL 03375.)
He gave Rullan the option to "continue with the project or . . . bring it to a conclusion." (*Id*.) On
May 20, 2012, Greenberg sent Rullan another email, writing that "there is n[o] position for you
at Timber Ridge and I can not allow you to be physically on the camp grounds." (*Id*. at PL
03377.)

Rullan filed this lawsuit against Goden and Greenberg on August 14, 2012. Since then,
Rullan has amended the complaint to add TRI, YWL, and YWI as defendants. On September 23,
2015, the court denied Greenberg's motion for summary judgment, granted in part and denied in
part Goden's motion for summary judgment, and denied Rullan's cross-motions for summary
judgment.

## ANALYSIS

The defendants have moved to dismiss for failure to state a claim under Fed. R. Civ. P.

12(b)(6). A court considers only the pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters outside of the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F. Supp. 2d 551, 556 (D. Md. 2003). There are two requirements for a proper Rule 12(d) conversion. *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013). First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious"). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Greater Baltimore*, 721 F.3d at 281.

The defendants had adequate notice that their motion might be treated as one for summary judgment. The defendants submitted and relied upon materials beyond the plaintiff's complaint in its 12(b)(6) motion. Moreover, in reply to the plaintiff's opposition and request that the court treat the motion to dismiss as a motion for summary judgment, the defendants submitted additional documentary exhibits. If the defendants had thought that they needed additional evidence to oppose summary judgment, Rule 56(d), which they have not invoked, afforded them the opportunity to seek further discovery through an affidavit. *See* Fed. R. Civ. P. 56(d); *see also Greater Baltimore*, 721 F.3d at 281 ("[The defendant] took 'the proper course'

when it filed the Rule 56([d]) Affidavit, 'stating that it could not properly oppose . . . summary judgment without a chance to conduct discovery.'") (citation omitted); *Laughlin*, 149 F.3d at 261 (refusing to overturn district court's grant of summary judgment on assertions of inadequate discovery when the nonmoving party failed to make an appropriate motion under Rule 56([d])). Therefore, the court will consider the affidavits and additional materials submitted by the parties and will treat the motion of the defendants as a motion for summary judgment.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the

court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774,

778-79 (4th Cir. 1993) (internal quotation marks omitted).

I.      Personal Jurisdiction over TRI

Defendant TRI has filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), arguing

that the court cannot assert personal jurisdiction over it. Where, as here, the district court decides

jurisdiction "by reviewing only the parties' motion papers, affidavits attached to the motion,

supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a

*prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson v.

Anderson*, __ F.3d __, No. 14-1991, 2016 WL 861634, at *4 (4th Cir. Mar. 7, 2016). "When

determining whether a plaintiff has made the requisite *prima facie* showing, the court must take

the allegations and available evidence relating to personal jurisdiction in the light most favorable

to the plaintiff." *Id*.

A court may exercise general or specific personal jurisdiction. General personal

jurisdiction requires "continuous and systematic" contacts with the forum state. *See Helicopteros

Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984). For a court to have specific

personal jurisdiction, the defendant must have "purposefully established minimum contacts in

the forum State" such "that [it] should reasonably anticipate being haled into court there."

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (internal quotation marks omitted).

When a federal court sits in diversity, it "has personal jurisdiction over a non-resident defendant

if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that

jurisdiction is consistent with constitutional due process." *Nichols v. G.D. Searle & Co.*, 991

F.2d 1195, 1199 (4th Cir.1993). "The reach of Maryland's long-arm statute is coextensive with the reach of the Due Process Clause of the United States Constitution, so the 'statutory inquiry merges with [the] constitutional examination.'" *Perdue Foods LLC v. BRF S.A.*, __ F.3d __, No. 14-2120, 2016 WL 682951, at *2 (4th Cir. Feb. 19, 2016) (quoting *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 878 A.2d 567, 580 (Md. 2005))."To determine whether specific jurisdiction lies in the forum state, we consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. The plaintiff must prevail on each prong." *Perdue Foods*, 2016 WL 682951, at *2 (internal quotation marks omitted).

Rullan asserts that personal jurisdiction is established under Maryland's long-arm statute, which provides that a court may exercise specific personal jurisdiction over a defendant, "who directly or by an agent . . . [t]ransacts any business or performs any character of work or service in the State." Md. Code § 6-103(b)(1). Rullan has presented evidence that TRI maintained an off-season administrative office in Maryland, and some of Rullan's claims arise out of TRI's actions "[t]ransact[ing] . . . business" in Maryland." *See id*. Specifically, Goden faxed Rullan the purported TRI and YWL stock certificates from the Maryland office. (Stock Transfer Certification.) At the top of both documents are the words "Timber Ridge" and a Maryland fax number. (*Id*.) Additionally, on January 17, 2012, Rullan traveled to the Maryland office and stayed there for more than two weeks in an attempt to improve management of the companies. (Rullan Decl. ¶ 54.) At the Maryland office, Rullan met with Goden and learned the full extent of the Camp's financial problems. (*Id*. ¶¶ 42, 55.) Although Goden claims that only YWL leased

the Maryland office, and TRI "only used such office to receive mail and did not conduct any

business activities there," (Goden Aff. ¶ 10, Mot. Dismiss Ex. 1, ECF No. 204-1), the evidence

indicates that TRI conducted business from the Maryland office. In any event, Rullan presents

evidence that YWL and TRI did not observe corporate formalities, and the defendants do not

dispute Rullan's claims that TRI and YWL shared the same financial records, YWL paid at least

some of TRI's bills, and Goden and Greenberg used corporate funds to pay their personal bills.

(*See* YWL Financial Records, Pl.'s Opp'n Ex. 8, ECF No. 229-7.) Although generally the

contacts of one entity do not impute jurisdiction to a related entity, a court may be able to

exercise personal jurisdiction when the companies fail to "maintain separate books and records,

employ separate accounting procedures, and hold separate directors' meetings." *See Mylan*

*Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 61 (4th Cir. 1993). Finally, the exercise of personal

jurisdiction in this case is "constitutionally reasonable" because "litigation is not so gravely

difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his

opponent." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 296 (4th Cir.

2009) (internal quotation marks omitted). Notably, a half-owner and officer of TRI lives in

Maryland, and the same lawyers have represented TRI and the other defendants throughout this

litigation. Rullan has made a prima facie showing that this court's exercise of specific personal

jurisdiction over TRI satisfies Maryland's long-arm statute and the Due Process Clause.

It appears that Rullan may also be claiming that this court can exercise general personal

jurisdiction over TRI. "For an individual, the paradigm forum for the exercise of general

jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which

the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v.*

16

*Brown*, 131 S. Ct. 2846, 2853-54 (2011). "With respect to a corporation, the place of

incorporation and principal place of business are paradigm bases for general jurisdiction."

*Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (internal quotation marks omitted). There is

no dispute that TRI is incorporated in West Virginia, but Rullan seems to be alleging that this

court may exercise general personal jurisdiction over TRI because its "principal place of

business" is in Maryland.

> "[P]rincipal place of business" is best read as referring to the place where a corporation's
> officers direct, control, and coordinate the corporation's activities. . . . And in practice it
> should normally be the place where the corporation maintains its headquarters—provided
> that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the
> "nerve center," and not simply an office where the corporation holds its board meetings
> (for example, attended by directors and officers who have traveled there for the
> occasion).

*Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010). The "principal place of business" is more than

"a mail drop box, a bare office with a computer, or the location of an annual executive retreat."

*Id.* at 97; *see also Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101,

105-06 (4th Cir. 2011) (holding that a corporation's principal place of business was in Michigan,

where nearly all of the high-level officers worked and made significant corporate decisions and

which was listed on its corporate filings as its principal place of business). When determining the

"nerve center," "the focus remains on the location of direction, control, and coordination of the

corporation's activities." *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 174 (4th Cir. 2014).

The evidence, viewed in the light most favorable to Rullan, indicates that TRI's

headquarters is in Maryland. In its tax returns and W-2 forms, TRI listed its address as 301 Main

Street in Reisterstown, Maryland. (TRI W-2 Form, Pl.'s Opp'n Ex. 2, ECF No. 229-1; TRI 2010

Tax Return, Pl.'s Opp'n Ex. 14, ECF No. 229-13; TRI 2013 Tax Return, Pl.'s Opp'n Ex. 19,

ECF No. 229-18; TRI 2010-2012 Tax Returns, ECF No. 230.) As previously discussed, Goden, a

Maryland resident who is one of two half-owners and officers of TRI, conducted business from the Maryland office, where she held meetings with Rullan and sent TRI stock certificates. (Goden Aff. ¶ 5; Rullan Decl. ¶¶ 42, 54; Stock Transfer Certification.) There is no indication that, aside from the summer months when the Camp is in session, Goden oversaw TRI's activities from anywhere other than Maryland. The Maryland address is used for a range of TRI business: Two Deeds of Trust in excess of $1 million from TRI to the Fred Greenberg Revocable Trust list TRI's address as the Maryland office, and when Capon Valley Bank wrote to TRI about a loan, the bank sent the correspondence to the Maryland address. (Capon Valley Bank Letter, Pl.'s Opp'n Ex. 3, ECF No. 229-2; June 18, 2013 Deed of Trust, Pl.'s Opp'n Ex. 4, ECF No. 229-3; August 14, 2014 Deed of Trust, Pl.'s Opp'n Ex. 5, ECF No. 229-4.) Finally, Alex Reece, TRI's 30(b)(6) representative, confirmed that TRI stored all of its files in the Maryland office. (Reece Dep. 118, Pl.'s Opp'n Ex. 6, ECF No. 229-5.) Although some documents are taken to the Camp during the summer, "they'll be going back" to the Maryland office, and the documents are "not stored at camp ever." (*Id*. at 118-19.) Construing all of the allegations and evidence in the light most favorable to the plaintiff, as the court must at this stage, the court concludes that Rullan has made the requisite prima facie showing of personal jurisdiction. TRI's motion to dismiss for lack of personal jurisdiction will be denied.

## II.      Service of Process

TRI and YWL move to dismiss on the grounds that they were not timely served with process. The amended complaint adding TRI and YWL as defendants was not "filed" for purposes of service until September 30, 2014, the same day the court granted the plaintiff's motion to amend the complaint and join the additional defendants. (ECF Nos. 145, 146.) Goden

accepted service of process on behalf of TRI on October 24, 2014, and Adam Spence accepted

service of process on behalf of TRI and YWL on October 28, 2014, (Proof of Service, Pl.'s

Opp'n Ex. 7, ECF No. 229-6), well within the time limit for service. *See* Fed. R. Civ. P. 4(m);

*see also Bolden v. City of Topeka, Kan.*, 441 F.3d 1129, 1148 (10th Cir. 2006) (the time limit for

service "provided by Rule 4(m) is not restarted by the filing of an amended complaint except as

to those defendants newly added in the amended complaint"). Accordingly, the court will deny

the defendants' motion to dismiss for insufficient service of process.

 III. Breach of Contract

 At the outset, TRI and YWL argue that the PSA is not binding on them because only

Goden and Greenberg, and not the two corporate entities, signed the PSA. The subject of the

PSA was the ownership of TRI and YWL, and at the time the PSA was executed, Goden and

Greenberg were the only two shareholders of TRI and YWL. Therefore, it is clear that Goden

and Greenberg signed the PSA on behalf of the companies. The court rejects this argument.

 TRI and YWL argue that Rullan has no cause of action for breach of contract because the

alleged oral employment agreement violates the Florida Statute of Frauds, the alleged agreement

was illegal and unenforceable, and the alleged agreement contained conditions precedent. The

court will address each of these arguments in turn.

 A. Statute of Frauds

 Rullan claims that Goden and Greenberg, on behalf of TRI and YWL, entered into an

oral employment agreement with him when they met in Florida in Decemeber 2010. (Am.

Compl. ¶ 119, ECF No. 146.) The court previously dismissed this claim as to Greenberg and

Goden because it was barred by the statute of frauds, as the agreement could not be performed

within one year of its making. *See* Fla. Stat. § 725.01 ("[A]ny agreement that is not to be performed within the space of 1 year from the making thereof . . . shall be in writing and signed by the party to be charged therewith. . . ."). This was so because the alleged oral agreement was reached in early December 2010, but the year-long employment agreement that was its focus was not to begin until January 2011.

Rullan raises an argument that the court previously rejected, suggesting that Florida's statute of frauds did not render the oral employment agreement unenforceable because the agreement was actually fully performed. *See Rubenstein v. Primedica Healthcare, Inc.*, 755 So.2d 746, 748 (Fla. Dist. Ct. App. 2000) ("The statute of frauds only applies to executory contracts, not to agreements that have been fully performed."). He argues that the December 2010 agreement was superseded by Rullan and Goden's February 2011 oral agreement that Rullan had become Goden's partner and co-owner in the camp and the August 2011 PSA. He claims the parties had fully performed because the agreement authorized Goden to make Rullan a partner at any time during the first year of employment.

Rullan's argument ignores both his allegations in the amended complaint, which refer explicitly to "an oral agreement that was to last one year," (Am.Compl. ¶ 40), and Rullan's own minutes of the meeting that gave rise to the oral agreement, which repeatedly refer to an employment term of one year beginning in January 2011, (St. Andrews Minutes). The agreement was not fully performed, as Rullan concedes that the parties terminated it before the one-year term was completed. Accordingly, Rullan's claim for breach of this agreement is barred by Florida's statute of frauds, and summary judgment will be granted to TRI and YWL on this claim.

B.  Illegal Terms

TRI and YWL argue that the PSA is unenforceable because a "partnership" could not replace the stockholders in two corporations, and Rullan's immigration status caused the PSA to violate both federal tax law concerning S corporations and federal immigration law. All of these arguments lack merit. A contract may be "unenforceable on public policy grounds, such as illegality," but courts are "averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain." *Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 790 (4th Cir.1987) (internal quotation marks omitted).

The defendants cite no support for their argument that Rullan could not be a partner as well as a shareholder in TRI and YWL. The court will not find the agreement unenforceable on this basis.

The defendants also argue that the PSA is unenforceable because an S corporation (also known as a "small business corporation") may not "have a nonresident alien as a shareholder." 26 U.S.C. § 1361(b)(1)(C). It is undisputed that TRI and YWL were S corporations and Rullan was a "nonresident alien." But a nonresident alien's purchase of stock in an S corporation is not illegal. Rather, such a purchase merely causes the entity to lose its tax status as an S corporation. *See* 26 U.S.C. § 1362(d)(2)(A) (a corporation's election to be an S corporation is "terminated whenever . . . such corporation ceases to be a small business corporation"). Therefore, this argument fails.

Additionally, the defendants claim that the PSA violated federal immigration law because Rullan's E-2 visa only allowed him to work in the United States for YWI, not TRI or YWL. But the PSA did not call for Rullan to work in the United States, and the PSA says nothing about

how Rullan would earn a salary, other than that Goden and Rullan would pay themselves "an

equal salary." It is clear from the evidence that Rullan's work was in Europe, recruiting

European children to attend the Camp. Even if some of his work was in the United States, his E-

2 visa allowed him to work in this country for YWI from August 16, 2011, to August 14, 2013.

(E-2 Visa, Mot. Dismiss Ex. I, ECF No. 204-11.) Because the PSA did not call for a violation of

federal immigration law, the defendants' argument fails.[5] TRI and YWL have not demonstrated

that the PSA is unenforceable on public policy grounds, and their motion will be denied on this

claim.

### C.  Conditions Precedent

TRI and YWL argue that the PSA was an unenforceable letter of intent to enter into a

later agreement, focusing on the language in the PSA providing that "[a]fter this agreement, a

due diligence of the company and the additional legal papers required for the transaction will be

made." Rullan responds that the PSA unambiguously demonstrates the parties' intent to be

bound and, more specifically, that the provision is not a condition precedent but instead is plainly

an agreement to undertake certain tasks "[a]fter th[e] agreement." The court ruled in favor of

Rullan on this issue in its earlier opinion as further explained below.

"The fundamentals of a legal 'contract' are competent parties, legal subject-matter,

valuable consideration, and mutual assent." *Wellington Power Corp. v. CNA Sur. Corp.*, S.E.2d

680, 684 (W. Va. 2005) (internal quotation marks omitted). "There can be no contract" if "the

minds of the parties are not in agreement" as to "one of these essential elements[.]" *Id.*

Furthermore,

---

[5] The court does not address whether Rullan complied with federal immigration law. To determine that the PSA is not unenforceable on public policy grounds, it is sufficient to find that the PSA did not require Rullan to violate federal immigration law.

> it is well established that it is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them. In other words, a valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent.

*Dan's Carworld, LLC v. Serian*, 677 S.E.2d 914, 918 (W. Va. 2009) (citations and internal quotation marks omitted).

Nothing in the PSA indicates that it is a letter of intent as opposed to a contract. The words "letter of intent" do not appear in the PSA, and the PSA does not state – or even suggest – that the parties have reserved the right not to be bound. Rather, the PSA provides, among other things, that Greenberg "sells" to Rullan 50% of the stock of both YWL and TRI for $500,000, to be paid over a period of ten years, and that Rullan's deposit of more than $50,000 "[is] considered as the payment" for the first 5% of YWL's and TRI's total stock. Greenberg and Goden, the only two shareholders of TRI and YWL at the time, indicated their intent to bind the companies by the PSA's terms by initialing and signing it. The PSA contains no ambiguous language as to the parties' intent to be bound by its terms, which are sufficiently definite to create binding obligations. The PSA therefore evidences mutual assent and is an enforceable contract.

Even if the PSA were a "preliminary agreement," despite being titled an "agreement" and containing no conditional language, it would still be enforceable. The Fourth Circuit addressed the distinction between letters of intent and traditional contracts in *Burbach Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401 (4th Cir. 2002), a case where West Virginia law controlled. The court noted that "[w]hile bare-boned 'agreements to agree' are not binding, courts have recognized two kinds of preliminary agreements that are binding and enforceable,"

called Type I and Type II. *Burbach*, 278 F.3d at 407. A Type I agreement "occurs when parties

have reached a complete agreement (including the agreement to be bound) on all issues

perceived to require negotiation." *Id*. "Such an agreement is preliminary only in form – only in

the sense that the parties desire a more elaborate formalization of the agreement" that is desirable

but not necessary. *Id*. "Type I agreements bind parties to their ultimate contractual objective in

recognition that a contract was reached, despite the anticipation of further formalities." *Id*. The

following factors are relevant to determining whether a Type I agreement has been made:

> 1) whether there has been an express reservation of the right not to be bound in the
> absence of a writing, 2) whether there has been partial performance of the contract, 3)
> whether all of the terms of the alleged contract have been agreed upon, and 4) whether
> the agreement at issue is the type of contract that is usually committed to writing.

*Id*. at 408.

> Unlike Type I agreements, Type II agreements
>
> do not commit the parties to their ultimate contractual objective. Rather, they commit the
> parties to negotiate the open issues in good faith in an attempt to reach the contractual
> objective within the agreed framework. Under this duty to negotiate in good faith, a party
> is barred from renouncing the deal, abandoning the negotiations, or insisting on
> conditions that do not conform to the preliminary agreement.

*Id*. at 407. The following factors are relevant to determining whether a Type II agreement has

been made: "1) the language of the agreement, 2) the existence of open terms, 3) whether there

has been partial performance, 4) the context of negotiations, and 5) the custom of such

transactions." *Id*. at 408.

   If the Burbach framework does apply to the PSA, the PSA is a Type I preliminary

agreement. As for the first Type I factor, whether there is an express reservation of the right not

to be bound, the PSA contains no such term. The provision that "[a]fter this agreement, a due

diligence of the company and the additional legal papers required for the transaction will be

made" simply provides that the parties will undertake any legal formalities necessary to transfer Greenberg's stock to Rullan. If the defendants wanted to condition the transaction on the satisfactory completion of a due diligence review, they could have insisted on such a term in the PSA. Under West Virginia law, however, courts "will not imply a condition precedent that rational parties could have drafted explicitly into their agreement, if they had desired it." *E. Shepherdstown Developers, Inc. v. J. Russell Fritts, Inc.*, 398 S.E.2d 517, 520 (W. Va. 1990). The language of an agreement "is arguably the most important factor in a court's analysis," *Burbach*, 278 F.3d at 408, and the PSA's language clearly favors the existence of an agreement.

The second factor, whether there has been partial performance of the contract, weighs in favor of finding the PSA to be a Type I agreement. Rullan contributed $105,000 to the business, including $55,000 used to capitalize YWI, most of which was used as Rullan's first payment for TRI and YWL, according to the PSA.

The third factor, which assesses whether all of the terms of the alleged contract have been agreed upon, is neutral. Several of the PSA's terms, including those providing for the development of a procedure by which "the partners will make decisions" and for an equal salary to be set for Goden and Rullan, require some degree of future agreement. But those terms are not material to the focus of the transaction – the transfer of stock from Greenberg to Rullan – and they are not so vague as to destroy the mutual assent necessary to support the agreement. *See Ridgeway Coal Co. v. FMC Corp.*, 616 F.Supp. 404, 407 (S.D.W.Va.1985) ("It is recognized that parties can agree to agree in the future. To do so, however, it is necessary that the terms to be agreed upon in the future be substantially drawn from the initial agreement.").

Finally, the fourth factor, which looks to whether the agreement is the type of contract

that is usually committed to writing, cuts in favor of finding the PSA to be a Type I agreement. The PSA was a written document, signed by the parties. Accordingly, whether or not the *Burbach* framework applies, the PSA is a contract and not an unenforceable letter of intent. TRI and YWL's motion for summary judgment will be denied on this claim.

    IV.    Shareholder Oppression

    TRI and YWL contend that Rullan has no action for shareholder oppression because he was never a shareholder in TRI or YWL and never entered into a binding agreement to purchase Greenberg's shares of the companies. Rullan disagrees, citing the PSA and the two documents Goden signed that allegedly certify his purchase of TRI and YWL stock. Again, the court has resolved this issue in favor of Rullan.

    Rullan's claim of shareholder oppression as to TRI arises under West Virginia law, and his claim as to YWL arises under Maryland law. Both West Virginia and Maryland recognize shareholder oppression as a cause of action. The claim stems from state statutes that authorize dissolution of corporations. West Virginia law permits a court to dissolve a corporation when "[t]he directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent," W. Va. Code § 31D-14-1430(2)(B), and Maryland's statute provides that "any stockholder entitled to vote in the election of directors of a corporation may petition a court of equity to dissolve the corporation on grounds that . . . [t]he acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent," Md. Code Ann., Corps. & Ass'ns § 3-413(b)(2).

    Oppressive conduct is tied to a violation of fiduciary duty. West Virginia courts recognize that "[w]hile the officers and directors of a business corporation are accorded a rather

26

broad latitude in the conduct of the affairs of the corporation, they occupy a fiduciary relationship toward it and its shareholders. The same fiduciary relationship exists on the part of the majority shareholders of a business corporation toward its minority shareholders." Syl. pt. 2, *Masinter v. WEBCO Co.*, 262 S.E.2d 433, 435 (W. Va. 1980). "A violation of the fiduciary relationship may result from oppressive conduct, which is conduct that departs from the standards of good faith and fair dealing which are inherent in the concept of a fiduciary relationship." *Id.* at syl. pt. 3. "An attempt to 'freeze or squeeze out' a minority shareholder from deriving any benefit from his investment in a private business corporation, without any legitimate business purpose, may constitute oppressive conduct." *Id.* at syl. pt. 4. Similarly, in Maryland, "oppression" is "conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." *Bontempo v. Lare*, 119 A.3d 791, 804 (Md. 2015) (internal quotation marks omitted). Shareholder oppression only arises "when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the [minority shareholder]'s decision to join the venture." *Id.*

The defendants argue that Rullan's shareholder oppression claim must fail because he was never a shareholder of TRI or YWL, but Rullan presents evidence that contradicts that assertion. Specifically, Rullan points to the PSA, which contains a term that provides for his first purchase of 5% of TRI and YWL stock, as well as the documents signed by Goden that purport to certify Rullan's purchase of 10% of TRI and YWL. The defendants cite no authority that suggests that the PSA or the documents signed by Goden, both of which detail Rullan's payment of a specific amount of money for a specific amount of stock, were not sufficiently formal to

support a shareholder oppression claim. Although the parties dispute the evidentiary value of the

documents, the court does not assess the weight of the evidence when considering a motion for

summary judgment. Accordingly, TRI and YWL's motion for summary judgment on the

shareholder oppression claim will be denied.

V.      Financial Accounting

The defendants argue that Rullan has no cause of action for an accounting of TRI or

YWL because Rullan is not an owner of either entity. The court has already decided that Rullan

has sufficiently demonstrated that he was a shareholder of TRI and YWL to overcome a motion

for summary judgment on those grounds. Moreover, Rullan's shareholder oppression claim

against TRI and YWL will proceed, and both West Virginia and Maryland courts recognize an

accounting as an available form of relief against shareholder oppression. *See State ex rel. Smith*

*v. Evans*, 547 S.E.2d 278, 285 (W. Va. 2001) (citing *Masinter*, 262 S.E.2d at 441 n.12 (listing the

ordering of an accounting as a form of relief in an oppressive conduct lawsuit)); *Bontempo*, 119

A.3d at 821 (holding that an accounting is a possible equitable remedy for shareholder

oppression). Therefore, the court will deny TRI and YWL's motion for summary judgment on

the financial accounting claim.

VI.     Security for Costs

Greenberg and Goden also move under Local Rule 103.4 for an order directing Rullan to

show cause why he should not be required to post $500,000 security for costs. Local Rule 103.4

applies when the plaintiff both resides out of this district and seeks affirmative relief. When these

conditions are met, as they have been here, the Rule requires the court to issue a show cause

order upon motion. The court finds it unnecessary to issue a show cause order because Rullan

has responded to Greenberg and Goden's motion, showing cause why the security should not be required. When deciding whether to require a non-resident plaintiff to post security for the defendants' costs, the court considers various factors, including "'(1) the plaintiff's probability of success on the merits, and the background and purpose of the suit, (2) the reasonable extent of the security to be posted, if any, viewed from the defendant's perspective, and (3) the reasonable extent of the security to be posted, if any, viewed from the nondomiciliary plaintiff's perspective.'" *Mould v. NJG Food Serv. Inc.*, No. 13-1305, 2013 WL 6531778, at *1 (D. Md. Dec. 11, 2013) (quoting *Murphy v. Ginorio*, 989 F.2d 566, 569 (1st Cir. 1993) (citing *Aggarwal v. Ponce Sch. Of Med.*, 745 F.2d 723, 727-28 (1st Cir. 1984))).[6]

"[J]ust as factors such as the absence of attachable property within the district or the conduct of the parties may bear on a defendant's legitimate need for the prophylaxsis of a bond, so too, a plaintiff's ability to post surety for costs must weigh in the balance when the third figure of the equation is tabulated." *Aggarwal*, 745 F.2d at 728. "In requiring a security bond for defendants' costs, care must be taken not to deprive a plaintiff of access to the federal courts." *Simulnet E. Associates v. Ramada Hotel Operating Co.*, 37 F.3d 573, 575-76 (9th Cir. 1994). "The cases establish that a court may require security for costs when the plaintiff's claim is of dubious merit, plaintiff lacks financial responsibility, and defendant will incur substantial expense." *Soo Hardwoods, Inc. v. Universal Oil Products Co.*, 493 F. Supp. 76, 77 (W.D. Mich. 1980).

As for the first factor, Rullan has established some likelihood of success on the merits, at least as to the $105,000 he invested and some compensation for his time. At a minimum, he has shown the existence of meritorious claims that are progressing past summary judgment. Turning

---

[6] Unpublished cases are cited not as precedent but for the relevance and persuasiveness of their reasoning.

to the second factor, the reasonable extent of the security to be posted, if any, viewed from the defendants' perspective, the defendants have not demonstrated how their costs will reach anything close to $500,000. The defendants argue that because they have submitted an offer of judgment, Rullan may eventually owe them their costs pursuant to Fed. R. Civ. P. 68, which requires a plaintiff who fails to obtain a judgment more favorable than the unaccepted offer to pay the costs incurred after the offer was made. *See* Fed. R. Civ. P. 68(d). The defendants concede that attorneys' fees are not recoverable under Rule 68 in this case. They argue that their anticipated costs, exclusive of attorneys' fees, to proceed through trial will exceed $200,000, but they fail to explain how their post-offer costs will exceed $200,000, much less their requested security of $500,000, and the cost estimates they do provide are purely speculative. Because the court previously denied Goden's motion for sanctions, that motion provides no support for the defendants' request that Rullan post a bond. Moreover, Goden and Greenberg's argument that it will be impossible to recover $500,000 from Rullan because he is a Spanish citizen residing in Spain is unsupported and premature. Finally, looking to the third factor, the reasonable extent of the security to be posted, if any, viewed from the plaintiff's perspective, the defendants do not dispute that Rullan has already contributed $105,000 to YWL and YWI, both of which are entities located in this district. Rullan has asserted that he has spent all of his life's savings investing in the Camp, and the court is concerned that requiring Rullan to post a security of $500,000 would deny him access to the court. Because Rullan's claims are potentially meritorious and a security bond of $500,000 is not reasonable under the circumstances, Rullan will not be required to post security and the defendants' motion for a show cause order will be denied.[7]

---

[7] The court does not find that the defendants' motion for a show cause order was sufficiently without merit to justify

**CONCLUSION**

For the reasons stated above, TRI's motion to dismiss for lack of personal jurisdiction will be denied; TRI and YWL's motion to dismiss, construed as a motion for summary judgment, will be granted in part and denied in part; and Greenberg and Goden's motion for a show cause order will be denied.

A separate order follows.


<u>March 24, 2016</u>                                    _____/S/_____
Date                                                                Catherine C. Blake
                                                                    United States District Judge

---

granting Rullan's request for the attorneys' fees he incurred defending this motion.